**JAY F. ZOOK, INC., Plaintiff,**

v.

**Philip N. BROWNSTEIN, Commissioner, Federal Housing Administration, Defendant.**

**Civ. A. No. C 62–728.**

United States District Court
N. D. Ohio, E. D.

Jan. 8, 1965.

Ray T. Miller of Miller & Miller, Cleveland, Ohio, for plaintiff.

Merle M. McCurdy, U. S. Atty., Joseph D. Guilfoyle, Asst. Atty. Gen., and Irwin Goldbloom, Atty., Department of Justice, Washington, D. C., for defendant.

BATTISTI, District Judge.

This is an action for a declaratory judgment whereby J. F. Zook, Inc., Plaintiff-Mortgagee (sometimes hereinafter referred to as Zook), seeks an order declaring a certain loan insurance commitment issued by the Federal Housing Administration (hereinafter referred to as FHA) to be in full force and effect. The Defendant, Commissioner of the FHA (hereinafter referred to as the Government), urges that said commitment should be declared null and void on the ground that Zook made certain false certifications or material misrepresentations within the meaning of 12 U.S.C.A. § 1709(e).

On May 12, 1959, Zook, as a proposed mortgagee, filed an application with the FHA for insurance on a mortgage loan to be obtained for the construction of a

multi-family housing project under Section 207 of the National Housing Act (Stipulation of Facts, Paragraph 1). The project, now completed, is located in Youngstown, Ohio, and is known as Kennedy Park. The mortgagor is Kennedy Park, Inc.

Although Kennedy Park was not yet incorporated at the time of the filing of the application for insurance, Zook had already disclosed the financial resources of the proposed mortgagor (Kennedy Park, Inc.), together with an estimate of its financial requirements. (See Court's Exhibit A and Tr. at pp. 57 & 58.) Some time in the late summer or early fall of 1959 (see Tr. p. 55), Kennedy Park was duly incorporated.

After the application for insurance was filed, the FHA made a study of the proposed project and concluded that it would be economically feasible (Tr. 278–281). Thereafter, on June 11, 1959, the FHA, by its authorized agent, William H. Hackman, Director, Cleveland Office, issued a commitment to insure the proposed mortgage loan.

The FHA commitment (Court's Exhibit B) included, *inter alia*, the following provisions:

"This administration, having considered your application and exhibits submitted therewith for the insurance of a mortgage upon the above projects, finds said project to be eligible for insurance under the provisions of Section 207 of the National Housing Act, and Administrative Rules and Regulations thereunder now in effect. Subject to such Rules and Regulations and to the following conditions, the Commissioner will endorse as insured (but only to the extent of advances approved by the Commissioner) an original credit instrument, secured by a first mortgage upon the land and property included in the project, as hereinafter identified, in an amount not to exceed $1,576,100.00:

*      *      *      *      *

"3. There shall be delivered, at closing, in form satisfactory to the Commissioner:

*      *      *      *      *

"H. Your certificate, as mortgagee, on FHA Form No. 2434, containing the information required by said certificate and itemizing the charges made by you in connection with the mortgage transaction (Rules, Section 232.2) and evidencing the collection by you or your nominee from the mortgagor of the following sums to be applied to the following items (Rules, Section 232.19):

"1. Deposit to meet cost of equipping and renting project subsequent to completion and to be applied to taxes, mortgage insurance premiums, and hazard insurance premiums accruing subsequent to closing, and not included in the proceeds of the mortgage, $31,-522.00.

"2. Funds (if any) required over and above mortgage proceeds for completion of the project, $451,012.80.

"The said sum represents the difference between the Commissioner's estimate of the total cash required for carrying charges, financing and for construction of the project, including Builder's and/or Sponsor's Profit and Risk and Architect's fees, and the maximum amount of the mortgage agreed to be insured, as aforesaid. The said fund may be reduced by so much of said fees, up to a maximum of $151,299.00, as the closing documents show are not to be paid for in cash.

"3. Escrow Deposit (if any) to cover off-site utilities and streets, $63,538.00."

On October 19, 1959, Zook and Kennedy Park, Inc., entered into a building loan agreement whereby Zook agreed to loan the sum of $1,576,100.00 to Kennedy Park, Inc.

The initial closing for the Kennedy Park project was held on November 13, 1959. On that date, Zook, as required by paragraph H of the Commitment, presented a completed Form No. 2434 to FHA. While Form 2434 was officially submitted on November 13, 1959, it is evident from the testimony of Mr. Hackman that the FHA had received the information contained therein several days prior to November 13. Form 2434 (Court's Exhibit O), as prepared by Zook, reads in part as follows:

"We hand you herewith a check for Seven Thousand Eight Hundred Eighty and 50/100 Dollars covering the first mortgage insurance premium, together with the other items called for in your Commitment dated June 11, 1959, and in any extensions or amendments thereof, and we certify that all the conditions thereof have been fulfilled to date:

\* \* \* \* \*

"8. The mortgagor has deposited with us or in a depository satisfactory to us and subject to our control, the following sums required by your Commitment: (Check applicable paragraphs.)

"X Funds required, if any, over the proceeds of the mortgage, to complete the project, which funds will be used before any mortgage money is advanced, in the amount of $ NONE.

"In lieu of cash, the mortgagor will supply services, or cause the same to be supplied, within the limitations permitted by your Commitment.

"Escrow deposit guaranteeing the completion of off-site utilities and streets in the amount of $————."

\* \* \* \* \*

To understand the above-quoted portions of Form 2434, it is necessary to review certain events which transpired prior to the initial closing. In May of 1959, the FHA, after analyzing the proposed project, estimated that the construction contract for Kennedy Park would require the expenditure of $1,770,-433.00 (Exhibit H). After this estimation had been made, and before the initial closing, Kennedy Park, Inc., entered into a lump sum construction contract in the amount of $1,350,255.00 (Exhibit D), which was substantially lower than FHA's estimate (namely, $420,178.00). According to the testimony of Mr. Hackman, this was an extremely unusual circumstance:

"Now I can think of no occasion where we had a contract that was to any great extent lower than our estimate of cost. We have a great deal of experience in cost estimation, and virtually any case that we had insured heretofore and from this date forward was there a contract that was for amount less than what our estimate had been." (Tr. 245–246.)

As a result of the unusually low contract price, the total cash required for the construction contract, the architect's fees, and the various sums known as "carrying charges" was $407,371.00 less than the amount originally estimated by the FHA (See Exhibit H).

The FHA originally estimated that the total cash required for the construction contract, the architect's fees, and the carrying charges would exceed the amount of the mortgage proceeds by $327,506.80. As a result, however, of the intervening circumstances mentioned above, at the date of the initial closing, the revised estimated cash requirements for completing the project were $79,-864.20 less than the amount of the mortgage (hereinafter referred to as excess mortgage proceeds).

Pursuant to the provisions of paragraph H of the Commitment (Court's Exhibit B), Zook delivered to the FHA a completed Form 2434 at the time of the initial closing. In paragraph 8 of that form, Zook was required to state that Kennedy Park had deposited with Zook the "funds required, if any, over the proceeds of the mortgage to complete the project, which funds will be used before any mortgage money is advanced." Since at the date of initial closing the mortgage proceeds exceeded the esti-

mated costs by $79,864.20, Kennedy Park, Inc., was not required to make a deposit with Zook. It is clear that, for the purposes of determining the amount of the deposit required by paragraph 8, there was no requirement that any amount be set aside to cover the contingency that costs might, for a variety of reasons, have eventually exceeded the amount then contemplated.

In determining the amount of deposit required by paragraph 8, Form 2434, no consideration is given to a possible liability on the part of the mortgagor to pay what is known in the mortgage banking trade as a discount. In paragraph 18, however, the FHA seeks information relative to possible discounts which may be charged as a part of the mortgage transaction.

Prior to the date of the initial closing, Zook had entered into an agreement with Kennedy Park, Inc., whereby Kennedy Park agreed to pay the discount or financing expense incurred upon the sale of the mortgage (Stipulation of Facts, paragraph 16). The terms of this agreement are set forth in a letter from Mr. Edward Mamrack, Secretary of Zook, to Mr. Leroy Kendis, President of Kennedy Park (Court's Exhibit Q). At the date of the initial closing, the exact amount of the discount liability could not be determined. However, Mr. Mamrack, who handled the closing for Zook, estimated that the liability would be approximately $125,000.00. In preparing Form 2434, Mr. Mamrack filled in paragraph 18(d) (applicable to the discount liability) as follows:

"18. The undersigned certifies that:

"(Check—(a) (b) (c) or (d), whichever is applicable)

"(a) It has not and will not impose or collect from the mortgagor, sponsor, or contractor, any charge on account of any discount or warehousing fee other than the initial service charge, if any, set forth above.

"(b) In addition to the initial service charge, it has collected from _____, the amount of $_____ representing a discount or other financing charge.
(mortgagor-sponsor-contractor)

"(c) It has a firm commitment from _____ to purchase said loan when fully disbursed and fully insured at a discount of _____ and it has collected from _____
(mortgagor-sponsor-contractor)
the sum of $_____ to cover that discount.

"X (d) Said loan was originated for sale by the undersigned who does not, at this time, have a firm commitment or agreement to purchase said loan from which the amount of its loss, if any, in connection with such sale can be determined. The undersigned has collected from KENNEDY PARK, INC., the amount of $125,000.00 to be
(mortgagor-sponsor-contractor)
held in escrow under an agreement to cover any discount, warehousing fee or similar financing charge incurred by the undersigned in the bona fide sale or agreement to sell the mortgage.

"Such agreement provides that any part of the escrowed deposit not necessary to reimburse the undersigned for such discount, warehousing fee or similar financing charge which it may have to pay will be applied to the reduction of the insured mortgage or will be deposited in the Reserve Fund for Replacements of the mortgagor as directed by the Commissioner."

When Mr. Mamrack inserted the $125,000.00 figure in paragraph 18(d), as quoted above, he was treating the following items as collected:

| | |
|---|---|
| (1) Excess mortgage proceeds | $ 79,864.20 |
| (2) Credit for FHA examination fee ($4,728.30) and FHA inspection fee ($7,880.50) | 12,608.80 |
| (3) Deposit by Kennedy Park, Inc. | 8,886.00 |
| (4) Initial service charge | 23,641.50 |
| TOTAL | $125,000.50 |

(See Plaintiff's Exhibit 5 & 6)

The propriety of treating each of these items as collected will be considered below.

The Government urges by way of defense to this action that Zook, at the time it prepared Form 2434, paragraph 18(d), had not collected the amount set forth in paragraph 18(d); that the representations contained therein were false, material to the risk, and relied upon by the Government; and that, therefore, the contract of insurance is null, void, and of no effect. The Government further contends that the representations contained in paragraph 18(d) constituted either warranties or conditions precedent.

Before considering the various issues arising from the foregoing circumstances, it should be noted that the Government does not charge, in fact it disclaims, any fraud on the part of Zook (See Tr. p. 295); that at the time when final closing would normally have occurred, but for the Government's refusal to go forward, the construction of the project was completed for all practical purposes; and that FHA was informed by Zook that a final closing could be effectuated in such manner that all obligations of the mortgagor, including the collection of the discount fees in question, could be satisfied.

Turning first to the propriety of Mr. Mamrack's treating as collected, for the purposes of Form 2434, paragraph 18(d), the excess mortgage proceeds, examination and inspection fees, deposit by Kennedy Park, Inc., and the initial service charge: The Government concedes that it was an unusual circumstance that excess mortgage proceeds existed. Fur-

ther, Mr. Mamrack testified that in his considerable experience with similar transactions, he never handled a case in which excess mortgage proceeds were involved. In treating the excess mortgage proceeds as collected, Mr. Mamrack used reasoning which is analogous to the reasoning behind paragraph 8 of FHA's Form 2434. Thus, Mr. Mamrack concluded that since Zook had an obligation to loan Kennedy Park, Inc., an amount which was $79,864.20 in excess of the estimated cost, he could therefor use these excess funds to cover Kennedy Park, Inc.'s obligation to Zook in the same manner that mortgage proceeds could be used for the purposes of Form 2434, paragraph 8, to cover estimated obligations of Kennedy Park, Inc., to third persons.

Form 2434, paragraph 18(d) speaks in terms of "collected" funds. For the purpose of determining the truth or falsity of the statement contained in said paragraph this fact may not be ignored. Concededly, there was an obligation on the part of Zook to disburse mortgage proceeds and a corresponding obligation on the part of Kennedy Park, Inc., to pay the possible discount obligation. If no other factors had been present, there would have been nothing to prevent the parties from treating a portion of the undisbursed mortgage proceeds as collected funds and using the same to satisfy Kennedy Park, Inc.'s obligation with regard to the discount. There was, however, another factor present which Mr. Mamrack failed to recognize, that is to say, that although the excess mortgage proceeds might in one sense have been under the control of Zook, neither Zook nor Kennedy Park, Inc., had an absolute right to determine that the excess mortgage proceeds were available for, or could be used for, the satisfaction of Kennedy Park, Inc.'s obligation to pay a discount.

Since Zook did not have an unconditional right to determine how mortgage funds were to be used, the Court finds that to the extent that Zook treated said proceeds as collected, the statement

contained in Form 2434, paragraph 18 (d) was false.

As to the deposit of the $8,886.00, the Government does not question the propriety of treating this item as collected for the purposes of Form 2434, paragraph 18(d) (See, Defendant's Brief, p. 36). Therefore, the Court finds that this amount was collected as of November 13, 1959.

In connection with the initial service charge of $23,641.50, Kennedy Park, Inc., was obligated to pay the same to Zook as of November 13, 1959. Mr. Mamrack, realizing that said amount would be included within the first advance of mortgage proceeds, decided that he would withhold this amount, the first advance and apply it to the discount obligation.

The Government does not question the propriety of the application of the initial service charge to the discount obligation (Defendant's Brief, p. 6). The Government contends, however, that the $23,-641.50 was not actually collected as of November 13, 1959, because the advance covering this amount was not approved by the FHA until December 8, 1959. The Plaintiff concedes that the $23,641.50 was not actually collected until some time after December 8, 1959 (Plaintiff's Brief, p. 28).

Prior to the initial closing, Kennedy Park, Inc., paid Zook $4,728.30 to cover the FHA examination fee and $7,880.50 to cover the FHA inspection fee. Zook, sometime prior to November 13, 1959, paid these amounts to the FHA (Stipulation of Facts, paragraph 3). It is clear that Kennedy Park, Inc., made the payments out of its own funds and not from mortgage proceeds.

Mr. Mamrack realized that Kennedy Park would be reimbursed for these payments out of the first advance of mortgage proceeds. Knowing that the $12,-608.30 obligation had already been paid, Mr. Mamrack reasoned that once the first advance had been made, Kennedy Park would have $12,608.30 of free funds which could be used to pay its discount obligation. Mr. Mamrack, therefore, decided to withhold this amount from the first advance.

The Government does not question the validity of Mr. Mamrack's reasoning (Defendant's Brief, p. 37), but it does contend that the $12,608.30 was not actually collected as of November 13, 1959, because the advance covering this amount was not approved by the FHA until December 8, 1959. This is the identical contention that was made with regard to Plaintiff's treatment of the initial service charge as collected.

Since the Plaintiff concedes that a collection cannot be effected under these circumstances until some time after the advance has been approved (See, Plaintiff's Brief, p. 28, Tr. 161–162), the Court, therefore, finds that the $12,608.30 had not been collected as of November 13, 1959.

By way of summary, the Court finds that Zook's statement in Form 2434, paragraph 18(d) that it had collected $125,-000.00 was false except to the extent of the $8,886.00 deposit.

Both parties concede that the incontestability provision contained in 12 U.S.C.A. § 1709(e) governs their respective rights. That section provides:

"Any contract of insurance heretofore or hereafter executed by the Commissioner under this title shall be conclusive evidence of the eligibility of the mortgage for insurance, and the validity of any contract of insurance so executed shall be incontestable in the hands of an approved mortgagee from the date of the execution of such contract, except for fraud or misrepresentation on the part of such approved mortgagee."

12 U.S.C.A. § 1709(e) was added to the National Housing Act in 1939. In the twenty five years that this section has been a part of the Act, there have been no reported decisions construing the same.

House Report No. 313, 76th Congress, 1st Session, sheds some light upon the

legislative intent behind 12 U.S.C.A. § 1709(e). House Report No. 313 states:

"There is added to the present law a new paragraph, the effect of which is to make the insurance contract of the administrator incontestable except for fraud or misrepresentation on the part of the insured mortgagee. This provision is similar in principle to provisions contained in all life insurance policies. The question has many times been raised as to whether or not the determination of one administrator as to the eligibility of a mortgage would be binding on some subsequent administrator, notwithstanding the fact that premiums had been paid over a period of years. This criticism is particularly apposite because under the law an agency of the Government cannot be estopped from denying the validity of the contract as is true of private insurance companies. It is thought that this provision gives the lending institutions the protection to which they are in fairness entitled."

■ The above-quoted language clearly indicates that the basic purpose behind 12 U.S.C.A. § 1709(e) was to make the law of estoppel applicable to the Government in cases where it challenged the validity of certain FHA insurance contracts. To effectuate this purpose, Congress provided that such contracts shall be incontestable "except for fraud or misrepresentation" on the part of an approved mortgagee.

As may readily be noted, the incontestability clause here in question is dissimilar to the incontestability clause usually found in ordinary life insurance policies in that it excludes from the scope of its coverage fraud or misrepresentation rather than fraud only. The incontestability provision is likewise dissimilar to the statutory incontestability provision applicable to National Service Life Insurance policies. That statutory provision, 38 U.S.C.A. § 802 provides:

"(w) Subject to the provisions of section 812 of this title, all contracts or policies of insurance before or after August 1, 1946 issued, reinstated, or converted shall be incontestable from the date of issue, reinstatement, or conversion except for fraud, nonpayment of premium, or on the ground that the applicant was not a member of the military or naval forces of the United States."

The Plaintiff contends that under 12 U.S.C.A. § 1709(e) the Government must show that a false statement has been made with regard to a material fact, with knowledge of its falsity and with intent to deceive. In support of this proposition, the Plaintiff relies in large part upon cases involving National Service Life Insurance policies. But, as noted above, the statutory provision applicable to those policies is not similar to the provision here in question in that it speaks only in terms of fraud. Plaintiff urges, however, that this distinction is of no significance. As stated by the Plaintiff:

"The words 'fraud or misrepresentation' indicate that it is only intentional misrepresentation which is intended here since any other use of the word would be more clearly set forth in the statute. Its use with the word 'fraud' whether it be in the conjunctive or disjunctive indicates an intention by Congress to have the incontestability of the contract circumvented only through intentional wrongdoing." (Plaintiff's Brief, pp. 3–4.)

The use of the words fraud and misrepresentation in the disjunctive is not unknown to the law of contracts. (See, Restatement, Contracts, Sections 470–491, wherein the words are used in the disjunctive and given separate and distinct meanings.)

■ It can only be concluded that when Congress used the words fraud and misrepresentation in the disjunctive in 12 U.S.C.A. § 1709(e) it clearly intended to give them separate and distinct meanings. Knowledge and intent to deceive are the only elements which could pos-

sibly serve to distinguish fraud from misrepresentation. To hold that proof of knowledge and intent to deceive are required by 12 U.S.C.A. § 1709(e) would be tantamount to holding that the words "or misrepresentation" are mere surplusage of no significance whatever. There is nothing in the legislative history of 12 U.S.C.A. § 1709(e) which warrants such a construction. For example, the fact that House Report No. 313 (quoted above) states that the provision is "similar *in principle* to provisions contained in all life insurance policies" (emphasis supplied) does not mean that Congress intended that the scope of the provision be *identical* to those contained in all life insurance policies. On the contrary, and as noted above, the basic purpose behind the Section was not to provide an incontestability clause identical to those contained in life insurance contracts, but rather to provide an incontestability clause which limits the basis of contest to certain actions on the part of an approved mortgagee.

In the enactment of 12 U.S.C.A. § 1709 (e), Congress was obviously aware that under general insurance law misrepresentation is a basis for avoiding an insurance policy only where a false statement has been made with regard to a matter which is both material to the risk and is relied upon by the party to whom it is made. (See, generally, Couch on Insurance, 2d, Vol. 7, Sections 35.76, 35.77, 35.78 and 35.88). It seems clear that in using the word misrepresentation in 12 U.S.C.A. § 1709(e), Congress merely intended to exclude from the scope of the incontestability provision misrepresentation of such character as would render a policy of insurance voidable under general insurance law.

■ The Government contends that 12 U.S.C.A. § 1709(e) does not require that the misrepresentation be material. The Government argues that if Congress had intended that a misrepresentation must be material, it would have so specified. This argument lacks merit, for a fair reading of the Section clearly indicates that Congress used the word mis-

representation in a generic context and did not thereby intend to characterize those misrepresentations which would render an insurance policy voidable. For such a characterization, the courts must look to the general insurance law.

The Court concludes, therefore, that in order for the FHA to avoid the policy of insurance on the basis of misrepresentation, it must show that Zook made a false statement as to a material fact which was relied upon by the FHA.

The Government contends that the statements made in Form 2434, paragraph 18(d) constituted either a warranty or a condition precedent. The Government further contends that if these statements were in any respect false, the policy of insurance was void *ab initio*.

12 U.S.C.A. § 1709(e) provides that policies of insurance are incontestable except for fraud or misrepresentation. In claiming a breach of warranty or condition precedent, the Government is contesting the validity of the policy of insurance. Unless a breach of warranty or condition precedent involves fraud or misrepresentation (as defined above), the same does not, under 12 U.S.C.A. § 1709(e), constitute a valid basis upon which the policy may be contested.

■ Furthermore, on consideration of the language contained in the relevant FHA forms, this Court is not prepared to go so far as to hold that the information supplied in Form 2434, paragraph 18(d) should be construed to constitute either a warranty or a condition precedent. Otherwise, an insignificant, unintentional, and wholly innocent failure on the part of the mortgagee to collect, for the escrow, even $1.00 less than the estimated amount certified at paragraph 18 (d) would provide a basis for avoiding the insurance commitment before or after final closing. (Incidentally, this appears to have been the position of the Government throughout this case.)

At the date of the initial closing, the FHA estimates the total costs which will be incurred in the construction of the

project (Joint Exhibit H, line 6). FHA also estimates how much working capital the project will require (Court's Exhibit H, lines 22 & 23). If a discount is to be charged, the FHA relies upon the mortgagee's estimate of the amount of the same. At this point it would be fair to assume that the FHA would want to see the financial statement of the mortgagor to determine whether the mortgagor is able to carry the burdens imposed by the estimated obligations. However, it seems that the FHA is not interested in such records, since in presenting its case no evidence was offered to indicate that it either sought or was given any financial statements of the mortgagor.

If the FHA does not wish to see the financial statements of the mortgagor, it seems important to determine how it obtains information relative to the ability of the mortgagor to bear the financial burdens of the estimated obligations. First, it knows the mortgage proceeds are available to meet the mortgagor corporation obligations. If, as is usually the case, the mortgage proceeds are not sufficient to cover the estimated expenses, the mortgagee is required to state that it has collected the difference. Further, it appears that the Government substantially prohibits the incurring of obligations by the mortgagor other than those estimated by the FHA and the mortgagee. (See, mortgagor's Certificate, Joint Exhibit L, paragraphs 2 & 3.) Thus, at the date of initial closing, the FHA knows that the mortgagor will have sufficient funds to cover the obligations as estimated by the FHA and the mortgagee. It seems clear that the primary purpose of the collection requirements is to assure the FHA that there are sufficient financial resources to meet the *estimated* liabilities. Since the FHA is not interested in seeing the financial statements of the mortgagor, it is clear that the FHA neither knows, nor evidently desires to know, whether the mortgagor has resources in excess of the estimated obligations.

As noted above, the situation that obtained at the date of the initial closing of the present case was extremely unusual. Both parties so admit. Thus, at that date the mortgage proceeds were sufficient to cover all of the estimated expenses set forth in Court's Exhibit H. In fact, there were excess mortgage proceeds in the amount of $79,864.20. Further, there were mortgage proceeds available to cover payments which had already been made by the mortgagor out of its own funds (i. e., FHA examination fee of $4,728.30 and FHA inspection fee of $7,880.50). Also, the payment of the initial service charge of $23,641.50 had been taken into account in determining the amount of excess mortgage proceeds, and the mortgagor had paid the mortgagee $8,886.00 which could be used to cover the mortgagor's obligations.

On or before the date of the initial closing, Mr. Mamrack estimated that the mortgagor's discount obligation would be $125,000.00. It is clear that, as of the date of the initial closing, the mortgage proceeds plus the $8,886.00 deposit were sufficient to cover all of the unpaid estimated obligations including the discount obligation. This is the exact situation that is desired by the FHA, and the result sought by the various requirements set forth in FHA Form 2434.

Using this approach, Mr. Mamrack realized and believed that the result desired by the FHA actually obtained as of the date of the initial closing. On the basis of this realization and belief, Mr. Mamrack stated that Zook had collected $125,000.00 from "Kennedy Park, Inc., Mortgagor." Thus, the Court finds that in preparing Form 2434 Mamrack was not acting in bad faith or with an intent to deceive. The unusual fact situation simply did not fit the FHA form.

The Court has already found that the statement inserted in Form 2434, paragraph 18(d) was false, in that the mortgagee did not have an unqualified right to determine that excess mortgage proceeds could be applied to the discount obligation; and the $23,641.50, $7,880.50, and $4,728.30 amounts were not technically collected until after the first ad-

vance had been approved (December 8, 1959).

But it is clear, that, except for the formality of FHA's approval of the first advance, the $23,641.50, $7,880.50, and $4,728.30 amounts could properly have been treated as collected as of November 13, 1959. The Government has not shown, and the Court is unable to discern, how the formality of approval of the first advance materially or significantly reflects upon the propriety of treating these amounts as collected as of November 13, 1959. Therefore, the Court concludes that as to these amounts, the false statements in Form 2434, paragraph 18(d) were immaterial.

Since the mortgagee did not have an unqualified right to determine that excess mortgage proceeds could be applied to the discount obligation, the mortgagee's statement in Form 2434, paragraph 18(d) was false to the extent that said proceeds were treated as collected. Mr. Hackman testified that had he known that excess mortgage proceeds were being treated as collected for the purposes of Form 2434, paragraph 18(d), he could not have closed. From Hackman's testimony, it logically follows that he could have required that Zook collect $79,864.20 in cash. Had this cash been collected, the mortgage proceeds, the $8,886.00 deposit, and the $79,864.20 in cash would, in total, have exceeded the estimated costs (including the discount obligation). This situation is somewhat paradoxical, since it appears that, as a practical matter, the FHA is only interested in knowing whether the mortgage proceeds plus the funds collected by the mortgagor equal the estimated costs, including the discount liability. Under Hackman's reasoning, when originally estimated costs are so reduced that excess mortgage proceeds are present at the date of the initial closing, and the financial outlook of the project brighter, the FHA requires that the mortgagor have relatively greater financial resources. For example, if in the present case the contract price had been $79,864.20 greater than it actually was, the financial outlook of the project would have been somewhat dimmer. Nonetheless, the FHA would only have been interested in knowing that there were financial resources equal to those Hackman claims he could have required here.

Throughout this case the Government has urged that it has no reason to assume that the mortgagor's obligation to pay a discount fee is any less firm than the mortgagor's obligation to pay the contractor. This is certainly true. A question arises, however, as to why, if at the time of initial closing, the mortgagee is allowed to "cover" the obligation of the mortgagor to the contractor with mortgage proceeds (See, Form 2434, paragraph 8), it would not likewise be entitled to cover the mortgagor's obligation to itself in the same manner under the provisions of paragraph 18(d) of the same Form 2434. On the evidence before this Court, there is no reasonable basis upon which the FHA could, at the date of initial closing, refuse to allow excess mortgage proceeds to be used to cover the financing fees. This conclusion is justified by the following considerations: (1) The record shows that the purpose of the various requirements for the initial closing (including those contained in paragraph 18(d) of Form 2434) is to assure the FHA that there are sufficient funds to cover the estimated costs, including the discount obligation; (2) Since the FHA does not desire to see the financial statements of the mortgagor as of the date of the initial closing, it is clear that the FHA neither requires nor is interested in knowing whether there are financial resources in excess of the estimated requirements; (3) There is no reasonable basis upon which to distinguish between the mortgagor's obligation to pay the contractor, etc., and its obligation to pay the mortgagee; (4) The situation as of the date of initial closing was extremely unusual, if not unique. Since a strict construction of Form 2434, paragraph 18 (i. e., that mortgage proceeds cannot be used to cover the discount

obligation) would be inconsistent with the manifest purpose of the closing requirements, it seems reasonable to assume that the drafters of Form 2434, paragraph 18 did not anticipate the fact situation that existed in this case; and (5) The basic result that the FHA desired actually obtained as of the date of the initial closing.

The Court, therefore, concludes that the false statement in Form 2434, paragraph 18(d) was not, under the circumstances, material to the Government's risk.

The Government claims that it relied on Zook's statement in Form 2434, paragraph 18(d) which reads, in part, as follows:

"The undersigned has collected from _____ _____
                                  (mortgagor-sponsor-contractor)

    the amount of $_____ *  *  *."

---

It is clear that the above-quoted portion of Form 2434, paragraph 18 contemplates a disclosure of the party who has paid the discount obligation. Form 2434, paragraph 18(d), as prepared by Mr. Mamrack, reads as follows:

"The undersigned has collected from KENNEDY PARK, INC.
    the amount of $125,000.00."         (mortgagor-sponsor-contractor

---

At trial, Mr. Hackman testified as follows:

"Q - Mr. Hackman, did you understand that the discount had been paid?

"A - I did.

"Q - By whom?

"A - By the sponsors. Not, certainly, by the mortgagor corporation.

"Q - The Certificate, paragraph 18 (d), states that it has collected from Kennedy Park, Inc. You understand that was collected?

"A - I did.

    *    *    *    *    *    *

It is abundantly clear from the above-quoted testimony that Mr. Hackman knew that the "mortgagor" had not paid $125,000.00 in cash to Zook. The only reasonable inference which may be drawn from Mr. Hackman's comment, "Not, certainly, from the mortgagor," is that he realized that Kennedy Park, Inc., did not have $125,000.00, in cash, to pay the discount obligation. Mr. Hackman's realization was almost certainly based upon his knowledge of the financial condition of the mortgagor, as projected in the Application for Mortgage Insurance (Joint Exhibit A). It is equally clear, then, that Mr. Hackman knew that the statement contained in Form 2434, paragraph 18(d) was false.

However, the Government takes the position that even if Mr. Hackman knew that the funds had not been paid by the "mortgagor," this fact does not vitiate the Government's claim of reliance because, insofar as the Government is concerned, it makes no difference whether the funds are paid by the sponsor or contractor, rather than the mortgagor. This argument begs the question, for the relevant consideration is not whether the FHA would have been satisfied if any one of a number of fact situations had been true, rather, the question is whether the FHA knew that the facts as represented were untrue.

Mr. Hackman's statements take on further significance when viewed against the extremely unusual situation that ex-

isted at the time of initial closing. For example, since Hackman knew that the mortgagor did not have $125,000.00, in cash, he could just as well have concluded that something other than cash had been used for the purpose of Form 2434, paragraph 18(d)—specifically excess mortgage proceeds. But this consideration also somewhat begs the question, because the fact the FHA knew that the representation was false in and of itself vitiates any claim of reliance.

Since the FHA knew that the statement contained in Form 2434, paragraph 18 was false, there is no reasonable basis upon which it may be held that the FHA relied on said statement. The Court, therefore, concludes that the FHA did not rely on the statement contained in Form 2434, paragraph 18(d).

The Government further claims that the insurance commitment should be declared void because, after initial closing and during the construction period, the mortgagee indulged in certain other alleged misrepresentations relating to the financing or discount fees required by Form 2434, paragraph 18(d). No useful purpose will be served by setting forth the alleged misrepresentations because notwithstanding the fact that the Government knew the statement contained in Form 2434, paragraph 18(d) to be false, and, further, notwithstanding the fact that the Government allegedly considered the subject matter of the statement to be material, the Government nevertheless chose to endorse the mortgage for insurance. Under these circumstances, a reasonable insurer should have either refused to enter into the insurance contract or should have investigated further to determine the true state of the facts. If the true state of the facts was found to be unsatisfactory, the reasonable insurer would not have entered into the contract.

If in the present case the FHA had made inquiry relative to the statement which it knew to be false, it would have learned of the approach which Mr. Mamrack was taking with regard to the financing fees. If that approach had not been satisfactory, the FHA could have refused to endorse the mortgage for insurance or it could have specified exactly what it required before insuring the mortgage. Having ignored what it knew to be a false statement, the Government is estopped from denying the validity of the insurance contract on the basis of actions taken by the mortgagee pursuant to the approach that would have been disclosed, had the inquiry been made. The alleged misrepresentation in Form 2434, paragraph 18(d) was the result of what the Government claims was some sort of improper or wrongful approach on the part of Mr. Mamrack, but which the Court believes was simply an erroneous approach. (The Government's position in this connection is rather elusive, to say the least. It disclaims fraud, but refuses to admit the alleged misrepresentations to be innocent.) In any event, the alleged misrepresentations which were made subsequent to November 13, 1959 (with one exception which will be discussed later in this opinion) were simply an outgrowth of this erroneous approach. Further, had inquiry been made by the FHA relative to the statement which it knew to be false, the entire financing charge problem would have then been resolved and the subsequent conduct of the mortgagee, of which the FHA now complains, would not have occurred.

Under these circumstances, the Court finds that the Government is estopped from denying the validity of the insurance contract on the basis of the alleged misrepresentations which occurred subsequent to November 13, 1959.

Turning now to the final issue: In April of 1961, the FHA approved an advance (No. 17) in the amount of $10,-728.40. The request for approval of this advance specified that the funds were to be advanced to cover amounts due to the contractor. At the time this advance was approved, the mortgagor was already in deep financial trouble—specifically, the

mortgagor had fallen behind in the payment of interest. In order to prevent the project from going into default, it was necessary that the mortgagor raise funds to meet its interest obligation. Mr. Mamrack, being aware of this situation, was anxious to make some arrangements whereby the project would not be forced into default. He tried to contact the principals of the mortgagor corporation in order to see what arrangements might be made (Tr. 100). Both principals were out of the State. He contacted the mortgagor's accountant and explained the situation to him; and it was then decided that, in order to prevent the project from going into default, the mortgagee would withhold the interest from the $10,728.40 advance mentioned above with the understanding that when the principals returned they were to see that the contractor was paid.

The Government contends that it may avoid the policy of insurance on the basis of Mr. Mamrack's conduct in withholding the interest from advance No. 17. Certainly, the situation that obtained as of April, 1961 was potentially dangerous as far as the interests of the Government were concerned. The dangerous situation existed, however, as a result of the economic failure of the project. In taking the actions set forth above, Mr. Mamrack was attempting to remedy this dangerous situation, and, in so doing, was actually serving the interests of the Government by trying to prevent a collapse of the financial structure. On the evidence admitted in this connection, the Court finds that Mr. Mamrack's actions were entirely reasonable and do not form a basis upon which the Government may avoid the policy of insurance.

Accordingly, the Court concludes that the FHA commitment of insurance on the mortgage loan to Kennedy Park, Inc., is a valid contract, and has been in full force and effect since the 11th day of June, 1959.

The foregoing memorandum opinion constitutes the findings of fact and conclusions of law required by the Federal Rules of Civil Procedure, Rule 52(a).