**FIRST INTERSTATE BANK OF BILLINGS, Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant.**

No. 94–5133.

United States Court of Appeals, Federal Circuit.

Aug. 2, 1995.

Lawrence Boyd Cozzens, Crowley, Haughey, Hanson, Toole & Dietrich, Billings,

MT, argued for plaintiff-appellee. With him on the brief was William D. Lamdin, III.

Hal Scott Shapiro, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and James M. Kinsella, Asst. Director.

Before RICH, MAYER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This case requires us to construe the "incontestability clause" that accompanies government loan guarantees under certain federal programs. The incontestability clause at issue in this case provides that the government's loan guarantee is incontestable "except for fraud or misrepresentation" of which the lender "has actual knowledge" or which the lender "participates in or condones." The Court of Federal Claims interpreted that language to require the government to prove that the lender acted with "intent to deceive" before the loan guarantee can be voided. The government has appealed, arguing that mere negligence with respect to the provision of false information to the government is sufficient to void the loan guarantee. We disagree with both of those standards and conclude that the government must prove a knowing misrepresentation, but not necessarily an intent to deceive, in order to void the loan guarantee at issue in this case. We therefore vacate the judgment of the Court of Federal Claims and remand for further proceedings.

I

In the fall of 1985, the DeJaegher Ranch near Melstone, Montana, was in serious financial trouble. The owners of the ranch, Thomas DeJaegher and his wife Catherine, had financed the ranch operations through the First Interstate Bank of Billings. In December of 1985, Scott Johnson, an assistant vice president and loan officer of the bank, determined that the bank could no longer continue to finance the ranch.

Thomas DeJaegher sought help from the federal government. He requested and ob-tained an emergency loan directly from the Farmers Home Administration (FmHA), and he asked the First Interstate Bank to obtain an FmHA loan guarantee for a separate loan to restructure his debt. In July of 1986, the bank asked the FmHA to guarantee 90 percent of a $400,000 loan. The guaranteed loan, along with most of the proceeds of the emergency loan, would be used to retire the bulk of the ranch's indebtedness to the bank.

The guaranteed loan request was approved, and in August 1986 the FmHA issued a conditional commitment. On December 16, 1986, the FmHA delivered the guarantee to Johnson. The loan guarantee agreement contained an "incontestability clause," which provided that the FmHA's obligation would be incontestable

> except for fraud or misrepresentation of which Lender or any Holder has actual knowledge at the time it became such Lender or Holder or which Lender or any Holder participates in or condones.

That clause was based on an FmHA regulation, which provides, in nearly identical language, that loan guarantees under a variety of FmHA loan guarantee programs are incontestable except for fraud or misrepresentation "of which the lender or holder has actual knowledge at the time it becomes such lender or holder or which lender or holder participates in or condones." 7 C.F.R. § 1980.11; see also id. §§ 1980.107, 1980.216, 1980.528. At the time the loan guarantee was delivered, Johnson advised the FmHA representatives that there had been no adverse changes in the DeJaeghers' financial position since the issuance of the conditional commitment in August.

One of the most important income sources for the ranch was a cow/calf lease agreement with Oppenheimer Industries. Under that agreement, Oppenheimer cattle were maintained on the ranch. In exchange for maintaining the cattle, the DeJaeghers received a percentage of the calves born to the Oppenheimer cows. The lease ran from year to year.

On September 16, 1986, Oppenheimer notified the DeJaeghers by letter that, because of changes in the tax code, Oppenheimer was

considering terminating its leasing program and removing its cattle from the ranch. In conversations that occurred during the same period, Oppenheimer representatives told Thomas DeJaegher that Oppenheimer might replace the cow/calf operation with a yearling operation. Under a typical yearling operation, a rancher receives income by providing care for the owner's two-year-old cattle. The rancher's income is calculated according to the yearlings' increase in size and value. On November 3, 1986, Thomas DeJaegher told Johnson of the possibility that the Oppenheimer arrangement would change.

Oppenheimer removed its cattle from the DeJaegher Ranch on November 21, 1986. The following month, Thomas DeJaegher informed Johnson of that development during a meeting at the bank. The exact date in December 1986 on which that meeting occurred was the primary area of factual dispute between the parties at trial.

Despite their efforts, the DeJaeghers were unable to find cattle to replace the Oppenheimer cattle. In light of the loss of the Oppenheimer cow/calf lease, the bank determined that it could not continue to provide operating funds for the ranch.

When the FmHA learned that the Oppenheimer cattle had been removed from the ranch, the agency formed the belief that Johnson had known about the removal before the loan guarantee issued on December 16, 1986, and that he had failed to disclose that information to FmHA officials. For that reason, the FmHA informed the bank that it was voiding the loan guarantee. The DeJaeghers subsequently defaulted on their loan to the bank. The bank then filed suit in the Court of Federal Claims to recover on the guarantee.

In ruling on the bank's summary judgment motion, the court held that negligent misrepresentation by the bank would not be sufficient to void the loan guarantee. Instead, the court held that because of the incontestability clause in the loan guarantee agreement, the government must prove that representatives of the bank acted with intent to deceive the FmHA. 27 Fed.Cl. 348, 353 (1992). Three weeks before trial, the government stated that it intended to seek to void the guarantee on the alternative ground that the bank had been negligent in servicing the loan. At the same time, the government represented that it intended to offer expert testimony on the negligent servicing defense. The bank filed motions in limine to preclude any expert testimony and to prevent the government from raising the negligent servicing defense at all. The court granted both motions.

After a three-day trial, the Court of Federal Claims ruled in favor of the bank, holding that the government had not made a sufficient showing to overcome the incontestability clause. Based on Johnson's testimony, the court found that the bank had no intent to deceive the FmHA. The court subsequently entered judgment in favor of the bank for the guaranteed portion of the unpaid loan, plus interest. The United States then took this appeal.

## II

The principal question on appeal is what the government must prove in order to void a loan guarantee containing an incontestability clause. The government maintains that the FmHA should have been relieved of its loan guarantee upon proof of a negligent misrepresentation by the bank, or at least upon proof of a knowing misrepresentation, and that the government should not have been required to prove that the bank had an intent to deceive the FmHA.

## A

■ The first part of the incontestability clause states that in order to void the loan guarantee, the government must prove "fraud or misrepresentation of which the lender or holder had actual knowledge." The government seeks to avoid the requirement of actual knowledge set forth in that portion of the incontestability clause by relying on the words "participates in or condones" that appear at the end of the clause. The government points out that no mental state is indicated for that portion of the incontestability clause and argues that a negligence standard must be adopted for that portion of the clause in order to avoid having the words

"participates in or condones" collapse into meaningless redundancy.

The language of the incontestability clause does not support the government's interpretation. The concepts of "participating in" and "condoning" both imply actual knowledge, not mere negligence. Furthermore, the phrase "participates in or condones" is not meaningless under an actual knowledge standard. That phrase simply clarifies that the lender does not have to be the party providing the false information; the guarantee may be voided even if the lender has actual knowledge of a misrepresentation made by someone else.

Moreover, the government's interpretation of the incontestability clause would deprive the clause of meaning. If the loan guarantee agreement contained no incontestability clause, the government could escape liability under established principles of law by proving negligent misrepresentation on the part of the lender. *See, e.g., First National Bank, Henrietta v. Small Business Admin.,* 429 F.2d 280, 287 (5th Cir.1970). Construing the incontestability clause to allow the government to void a loan guarantee upon a showing of negligent misrepresentation would thus render the loan guarantee no more incontestable than a guarantee that is not supported by an incontestability clause.

Significantly, several of the statutes that authorized the FmHA to guarantee farm loans at the time of the DeJaegher loan provided that the guarantees would be "incontestable except for fraud or misrepresentation of which the holder [had] actual knowledge." *See* Emergency Agricultural Credit Adjustment Act, § 208; Emergency Livestock Credit Act, § 7, both reprinted at 7 U.S.C. note preceding § 1961; *see also* 7 U.S.C. § 1928 (same language applicable to insured loans under the Consolidated Farm and Rural Development Act). Those statutes contained no reference to "participating in or condoning" fraud or misrepresentation. In light of that statutory language, the government concedes that under the general FmHA regulation governing incontestability, 7 C.F.R. § 1980.11, negligent misrepresentation is not sufficient to void an FmHA loan guarantee against the holder of a guaranteed

note. The government argues, however, that because the statutes refer only to holders, and not to lenders, the FmHA regulation can be read to provide that negligent misrepresentation is sufficient to void a loan guarantee against a lender, such as the First Interstate Bank.

There are two problems with the government's proposed differential treatment of holders and lenders. First, the incontestability clause and the regulation on which it is based do not distinguish between lenders and holders with regard to the incontestability of loan guarantees. The government is forced to take the implausible stance that the same language means one thing with respect to holders and something quite different with respect to lenders. There is simply nothing in the loan guarantee agreement or the regulations to support that assertion.

Second, the government's claim that the statutory references to "holder" were intended to exclude lenders who are also noteholders is entirely unconvincing. While a lender and a noteholder may be different, there is nothing that prevents a lender from also being a noteholder; indeed, every lender is a noteholder until and unless the lender transfers the note to another party. The statutory incontestability provisions therefore apply to all holders, and the implementing FmHA incontestability regulation applies equally to both a lender and a holder who did not make the loan.

Finally, the government argues that an "actual knowledge" standard provides an incentive for lenders to avoid obtaining knowledge about their debtors that they would have to reveal to the government. The government makes a valid point as a policy matter. An incontestability clause requiring actual knowledge gives banks an incentive not to ask questions, particularly in a case such as this one, in which the guaranteed loan offers the bank an opportunity to restructure a borrower's current debt and thereby shift to the government the bulk of the risk of a high-risk loan. The government's policy argument, however, cannot override the plain language of the agreement and the implementing regulations. The Court of Federal Claims was therefore cor-

rect in rejecting the government's argument that a negligent misrepresentation is sufficient to void the bank's loan guarantee.

## B

In the alternative, the government argues that the trial court erred by applying an "intent to deceive" standard that is more rigorous than the "actual knowledge" standard dictated by the language of the incontestability clause. We agree with the government and vacate the judgment on that ground.

As a basis for its decision, the trial court stated that the "pivotal factual issue in the case is whether Scott Johnson was guilty of an intent to deceive the Farmers Home Administration concerning loss of [the] Oppenheimer cattle before the guarantee was issued on December 16, 1986." The court found that Johnson had no intent to deceive the FmHA and did not act with "such recklessness ... concerning consequences" that is equivalent to an intent to deceive. Because the court focused on the issue of deceptive intent, the court did not make an explicit finding as to whether Johnson had actual knowledge of the loss of the cattle prior to the date the guarantee was issued.

The incontestability clause permits the loan guarantee to be challenged because of either fraud or misrepresentation. Although closely related, fraud and misrepresentation are distinct concepts with different elements. Fraud requires a specific intent to deceive or "a state of mind so reckless respecting consequences as to be the equivalent of intent." *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed. Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Misrepresentation does not require an intent to deceive. *See Womack v. United States,* 389 F.2d 793, 800, 182 Ct.Cl. 399 (1968) ("intent to mislead is not an essential element of actionable misrepresentation in the breach of contract context"); *compare* Restatement (Second) of Contracts § 159 (1979) (defining misrepresentation as "an assertion that is not in accord with the facts") *with id.* § 162 cmt. a (for a misrepresentation to be fraudulent, it

"must not only be consciously false but must also be intended to mislead another").

In a case involving another federal incontestability clause containing an exception for "fraud or misrepresentation," the court drew on the distinction between the two terms to reject the argument that misrepresentation required proof of an intent to deceive. *See Jay F. Zook, Inc. v. Brownstein,* 237 F.Supp. 800 (N.D.Ohio 1965). The court explained that requiring intent to deceive for misrepresentation "would be tantamount to holding that the words 'or misrepresentation' [in the incontestability clause] are mere surplusage of no significance whatever." *Id.* at 808.

To be sure, the difference between actual knowledge and intent to deceive is a narrow one that will not matter in most cases. Occasionally, however, the difference may be important. On the facts of this case, for example, it would have been possible for Johnson to have actual knowledge of the loss of the cattle without having an intent to deceive the FmHA. As the government points out, Johnson testified both that he did not understand that he was obligated to provide the FmHA with information after November 3, 1986 (the date on which the loan closed), and that he assumed that the FmHA already knew about the loss of the Oppenheimer cattle. In either case, Johnson could know of the loss of the cattle, but not harbor an intent to deceive.

The leading case from this court construing an FmHA guarantee containing an incontestability clause is *Everman National Bank v. United States,* 756 F.2d 865 (Fed.Cir.1985). In *Everman,* a dairy operator sought a guaranteed FmHA loan, which the Everman bank arranged. Before the guarantee issued, the bank discovered that the operator's permit to sell Grade A milk had been suspended, but it failed to inform the FmHA of the suspension. The court held that the bank was under a duty to disclose the fact of the suspension to the FmHA and that the failure to disclose that information constituted a misrepresentation within the meaning of the incontestability clause. 756 F.2d at 868–69. The court did not suggest that the government was required to prove an intent to deceive. In fact, the concurring judge, far from requiring

an intent to deceive, would have found mere negligence to be a sufficient basis for voiding the guarantee. *See Everman,* 756 F.2d at 869–70 (Bissell, J., concurring).

In this case, as in *Everman,* the principal issue is whether the bank had knowledge of facts that were sufficiently material to render the non-disclosure of those facts a misrepresentation within the meaning of the incontestability clause. Thus, the trial court should have determined whether the First Interstate Bank, through Johnson, had actual knowledge, prior to December 16, 1986, that the Oppenheimer cattle had been removed from the DeJaegher Ranch. The bank argues that such a finding is implicit in the trial court's conclusion that Johnson did not act either with an intent to deceive or with such recklessness concerning the consequences as to be the equivalent of an intent to deceive. It may be that by crediting Johnson's testimony on the issue of intent to deceive, the court implicitly credited his testimony that he did not learn of the removal of the Oppenheimer cattle from the DeJaegher Ranch until after the delivery of the loan guarantee. That fact is of central importance to the analysis of this case under an "actual knowledge" standard, however, and the court should make its finding on that issue independently of the "intent to deceive" standard. We therefore remand for a factual finding as to when Johnson learned that the cattle had been removed from the DeJaegher Ranch.

### C

The government contends that it should be entitled to void the loan guarantee not only if the bank had actual knowledge of the removal of the Oppenheimer cattle, but even if its knowledge was limited to the possibility that the cattle might be removed or the possibility that Oppenheimer might change its cattle leasing program from a cow/calf operation to a yearling operation. Actual knowledge of the possibility of either event, however, would void the guarantee only if that information were material. And information is material in this context only if "a prudent and reasonable banker would have reason to know that FmHA would regard [the fact in

question] as important." *Everman,* 756 F.2d at 869.

The bank admits that Johnson knew of the possibility that Oppenheimer would shift from a cow/calf operation to a yearling operation, but the bank contends that the information conveyed to Johnson was not sufficiently material to require its disclosure to the FmHA, because the information was speculative and because a shift from cow/calf to yearling would not significantly affect the ranch's financial condition. Once again, because the trial court focused on the absence of intent to deceive, the court did not find it necessary to make a finding on the issue of materiality. On remand, it will therefore be necessary for the court to make a finding as to the materiality of the information regarding the possible conversion from a cow/calf to a yearling operation. It will also be necessary for the court to make a finding as to whether, by December 16, 1986, the bank knew of the possibility that the Oppenheimer cattle would be removed entirely. If the court finds that the bank knew of that possibility, it will be necessary for the court to make a finding as to materiality on that issue as well.

### III

The government argues that the court made several errors in the course of the pretrial and trial proceedings. These contentions require only brief treatment.

First, the government objects to the court's order granting the bank's motion in limine to preclude the government from advancing a negligent servicing defense. This action was filed on June 22, 1990. The government did not express a clear intention to raise the negligent servicing defense until February 28, 1994, three weeks before trial. The government argues that under Rule 15(a) of the Rules of the Court of Federal Claims, leave to amend pleadings "shall be freely given when justice so requires." The decision whether to allow leave to amend pleadings, however, is within the sound discretion of the trial court. *Te–Moak Bands of Western Shoshone Indians of Nevada v. United States,* 948 F.2d 1258, 1260 (Fed.Cir. 1991). The government has not shown that

the trial court abused its discretion by preventing the government from mounting a negligent servicing defense when that defense was raised so close to the time of trial.

■ Second, the government claims that the evidence overwhelmingly established that Thomas DeJaegher informed Scott Johnson about the loss of the Oppenheimer cattle before the delivery of the loan guarantee on December 16, 1989, and that this court should therefore reverse the trial court's judgment outright. We disagree. The critical questions of what Johnson knew, and when, turn largely on witness credibility, and the task of weighing the credibility of witnesses is for the trier of fact; indeed, credibility determinations by the trial judge "can virtually never be clear error." *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). As we have noted, the trial court focused on the issue of intent to deceive and therefore did not make findings on whether Johnson knew of the loss of the Oppenheimer cattle, or the possible loss of the cattle, before the delivery of the loan guarantee. It would be a distortion of our role to draw conclusions about the facts, as the government asks, rather than having the trial court make its own findings in light of the "actual knowledge" standard that we have endorsed. *See Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986) (court of appeals should not engage in fact finding, but should remand to trial court to make requisite findings under proper legal standard).

Third, the government argues that the trial court erred in its rulings on two evidentiary matters. The government first claims that the trial court improperly refused to listen to the tape recording of an FmHA hearing on the agency's decision to void the loan guarantee. The bank points out, however, that the government was allowed to play the relevant portions of the tape at trial and that the government was permitted to question Johnson based on pertinent portions of the transcript of the meeting. Moreover, both the tape-recording and the transcript were admitted into evidence. Under these

circumstances, we discern no error in the court's handling of the evidence in question.

■ The government's second evidentiary claim is that the trial court erroneously excluded evidence relating to a meeting between representatives of the bank and the FmHA after the FmHA announced its intention to void the loan guarantee. The bank objected to the admission of statements made at that meeting on the ground that the meeting was part of the settlement process and that statements made at the meeting were therefore barred by Rule 408 of the Federal Rules of Evidence. Following a brief colloquy with counsel, the trial court found that the meeting was not part of an official appeal of the FmHA's decision to void the loan guarantee, but was "in the nature of a settlement conference."

We are unable to conclude that the trial court committed clear error in finding that the meeting in question was in substance a settlement conference and thus within the purview of Rule 408. As to the government's claim on appeal that the statements from the meeting were admissible for impeachment purposes even if the meeting constituted "compromise negotiations" within the meaning of Rule 408, the government failed to make that argument in response to the bank's objection to the evidence and therefore waived it.

## IV

We hold that the government may void the loan guarantee at issue in this case if it can show that, as of December 16, 1986, the bank had actual knowledge of a material fact reflecting a change in the ranch's financial condition that it failed to disclose to the FmHA. Because the trial court imposed a more exacting standard on the government, we vacate the judgment and remand for further proceedings. On remand, the trial court should make findings as to actual knowledge and, if necessary, materiality with respect to three issues: the actual loss of the Oppenheimer cattle, the potential loss of the Oppenheimer cattle, and Oppenheimer's potential shift from a cow/calf operation to a yearling operation. Of course, whether those findings can be made on the present record

or whether additional trial proceedings should be held is a matter for the discretion of the trial court.

Each party shall bear its own costs.

*VACATED AND REMANDED WITH INSTRUCTIONS.*