William Carlton DART, et al.,
Appellants

v.

UNITED STATES of America, et al.

No. 86–5715.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 19, 1987.

Decided May 31, 1988.

---

Robert MacCrate, New York City, Homer E. Moyer, Jr. and Frances J. Henderson, Washington, D.C., were on the brief, for amicus curiae, American Bar Ass'n, urging reversal.

William D. Outman, II, Washington, D.C., for appellant.

Mark B. Stern, Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Robert S. Greenspan, Dept. of Justice, and Thomas C. Barbour, Atty. Advisor, Dept. of Commerce, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and FRIEDMAN,[*] Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

In this case, we are asked to determine whether an agency followed required procedures in an enforcement action against appellant. The issues are technical; they involve intricate questions of statutory interpretation and legislative history. We must even decide whether Congress' omission of a single word from a law is significant. Such details may not seem worthy of extended consideration when the issue is entirely procedural.

The procedure at issue here, however, does compel our attention, for it implicates one of the most serious challenges faced by modern governments: protecting the individual citizen from the overweening power of a bureaucratic state. Indeed, the facts of this case validate Justice Frankfurter's view that "[t]he history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U.S. 332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819 (1943). Here, a citizen charged with violating an export law was absolved of liability by an independent administrative law judge who presided over five days of evidentiary hearings. Yet, that judgment was summarily reversed by a higher official who did not witness the presentation of evidence, who gave no rea-

---

[*] Sitting by designation pursuant to 28 U.S.C. § 291(a).

sons for his action, and who was a member of the prosecuting agency. This reversal was contrary to law, and the result was far from inconsequential: appellant was fined $150,000 and essentially prohibited from pursuing his present livelihood for fifteen years.

In vacating this result, therefore, we are motivated by much more than a belief in administrative punctilio. We find that the agency official had no authority to reverse the administrative law judge's decision. The enforcement action against appellant thus disregarded an important procedural safeguard—one that Congress expressly enacted to protect citizens accused of violating the export law at issue here. We also find that, notwithstanding a statutory provision that precludes judicial review of most enforcement decisions under this export law, Congress did not withdraw from the courts the power or obligation to enforce the procedural safeguard that was flouted here. Accordingly, we vacate the agency decision and remand the case for further consideration.

## I. BACKGROUND

William C. Dart seeks to overturn a decision by the Secretary of Commerce ("the Secretary"), imposing civil sanctions for violations of the Export Administration Act ("EAA" or "the Act"). 50 U.S.C. app. § 2401 *et seq.* (1982 and Supp. III 1985). Dart brought this action to enjoin the sanctions under 28 U.S.C. § 1361, arguing that they were imposed in violation of the EAA and of due process. The government asserts that the EAA precludes judicial review of Dart's claims. The trial judge agreed, dismissing Dart's suit for lack of jurisdiction, and Dart now appeals that dismissal.

Two difficult questions are thus raised on appeal. First, we must determine the scope of the EAA's so-called "finality clauses," which preclude judicial review of functions exercised, and of certain orders issued, by the Secretary under the EAA. If there is jurisdiction, we must consider whether the sanctions imposed violate either the EAA or, perhaps, the fifth amendment. These are essentially questions of first impression. Moreover, the questions of statutory violation and of our jurisdiction to review are closely related. Because we find that the order imposing sanctions against Dart exceeded the Secretary's authority under the EAA, we conclude as well that the Secretary's action does not fall within the category of proper "orders" or "functions" made unreviewable by the EAA. We need not examine the constitutional grounds that Dart offers for overturning the Secretary's order. *See Harmon v. Brucker,* 355 U.S. 579, 581–82, 78 S.Ct. 433, 434–35, 2 L.Ed.2d 503 (1958) (per curiam).

\* \* \* \* \* \*

In November 1984, the Commerce Department ("the Department") secured, *ex parte,* a temporary denial order, blocking export privileges for William C. Dart, two corporations in which Dart was a principal (hereafter collectively referred to as "Dart"), and several other individuals and corporations (the "export participants"). In April 1985, the Department issued a charging letter against Dart, alleging that he had attempted, in concert with the export participants, to ship two wafer polishers to Czechoslovakia without export licenses. Wafer polishers are used for the manufacture of integrated circuits. In this case, the polishers had been "upgraded" to approximate more advanced models that cannot be exported to Czechoslovakia, for reasons of national security. Customs agents seized the polishers at Los Angeles International Airport as they were being shipped out of the country.

An administrative law judge ("ALJ") held five days of evidentiary hearings on the allegations against Dart. In June 1986, the ALJ ruled that the Department had failed to prove that Dart "knew or reasonably should have known that the upgraded wafer polishers needed a validated license for export to Czechoslovakia." Joint Appendix ("J.A.") at 47. Charges against Dart were dismissed. On this appeal, we need not examine the correctness of the ALJ's finding, for our decision turns solely on the Secretary's procedural error in re-

versing the ALJ. Nevertheless, some understanding of the Secretary's disagreement with the ALJ on the merits of the case is useful in evaluating the procedural issue. We therefore briefly recount the facts.

Dart and the other export participants discussed the question of export licenses at an early stage of the planning, during a meeting in California. One of the officials from the firm that was upgrading the polishers vowed to travel to Washington, D.C. to ascertain whether licenses would be needed or available. Dart furnished the name of someone at the Commerce Department who would be appropriate to contact on this issue. It was during the subsequent trip to Washington that the representative from the upgrading firm was recruited to serve (along with his business colleague, who had remained in California) as a "citizen informant." When the informant returned to California, he did not tell Dart or the other participants that licenses were required and unobtainable for the upgraded polishers. Indeed, the status of such polishers was never clarified. The informant reported only that the older model of polishers did not require licenses and that the new, more advanced models could not be exported to Czechoslovakia.

Thus, the question confronting the ALJ in this case was what inference should be drawn from Dart's continued participation in the export project, after the informant returned from Washington, D.C. The government contended that Dart knew the upgraded polishers approximated the more advanced models and that the latter models could not be exported. Dart argued that, because the "citizen informants" continued to participate in the project, he assumed the result of the trip to Washington was positive—that upgraded polishers could be exported without licenses. The ALJ sided with Dart. He found three aspects of the case that buttressed Dart's defense. First, the "citizen informants" had taped 30 conversations among the export participants, and none of these contained any directly incriminating statements by or about Dart. Secondly, Dart himself had no economic interest in the polishers (although he was

engaged in other projects for profit with those among the export participants who did own the polishers). The ALJ agreed with Dart that, because he was only acting as a facilitator, he lacked the incentive to pay close attention to the licensing details. J.A. at 43. Finally, the ALJ noted that Dart had "some technical understanding of wafer polishers, but not any expertise." This would have hindered his appreciation of the type of upgrading for which the participants had contracted. J.A. at 42.

The Department appealed from the ALJ's decision to the Secretary, asserting that the ALJ failed to "examine critically, in their totality, all of the inter-related facts" and that his decision therefore "reveal[ed] a certain naivete in approach." J.A. at 61. The thrust of the Department's argument was that, as an experienced exporter, Dart surely realized that the reason for upgrading the polishers was to circumvent the licensing requirement. The Department cited circumstantial evidence supporting that conclusion. In July 1986, the Department's Assistant Secretary for Trade Administration (to whom the Secretary has delegated his EAA enforcement responsibilities; see 15 C.F.R. § 389.2 (1987)) overturned the ALJ's decision. He found that Dart "knew that a license was both required and had not been obtained" for the polishers. Josef Kubicek, et al., 51 Fed.Reg. 25,080 (1986). Purporting only to "modify" the ALJ's ruling, the Assistant Secretary imposed the $150,000 fine and the 15–year ban on Dart's export privileges. Id.

Thereafter, Dart filed an action in the District Court for the District of Columbia, challenging the Assistant Secretary's decision on constitutional and statutory grounds. Dart claimed the decision (1) violated due process (by reason of "entrapment," the destruction of evidence, and the violations of other "important procedural rights"), (2) was not supported by substantial evidence, (3) improperly disregarded the ALJ's factual findings, especially as to witness credibility, and (4) exceeded statutory authority under the EAA because the decision actually reversed the ALJ's ruling

when the EAA permits the Secretary only to "affirm, modify or vacate" such rulings. In October 1986, Judge Harold Greene dismissed the suit for lack of jurisdiction, relying on the EAA's finality provisions. Addressing Dart's main argument—that the Secretary was only permitted to "modify" the ALJ's decision—Judge Greene was unpersuaded that Congress' "failure to use the precise word ['reverse' in the EAA] was a deliberate decision to constrain the Secretary of Commerce." *William C. Dart v. United States*, No. 86–2264, memorandum op. at 4 (D.D.C. Oct. 8, 1986) (*"Memorandum Opinion"*).

## II. DISCUSSION

Section 13 of the EAA contains two finality clauses. 50 U.S.C. app. § 2412(a) and (c) (Supp. III 1985). Section 13(a) is general in nature: it proclaims that "functions exercised under this Act are excluded from the operation of" certain sections of the Administrative Procedure Act (APA). The APA sections that are rendered inapplicable to the EAA include those that guarantee judicial review for persons "adversely affected or aggrieved by agency action" and of "final agency action for which there is no adequate remedy in a court." 5 U.S. C. §§ 702, 704 (1982).

In July 1985—roughly one year prior to the ALJ's and the Assistant Secretary's decisions in the present case—Congress amended the EAA, adding a new section 13(c). That section imposes certain safeguards on the export sanctions process, to ensure fairer treatment by the Department of alleged EAA violators. However, the last clause of section 13(c) specifies that, on appeal from an initial enforcement determination, the "Secretary shall, in a written order, affirm, modify, or vacate the decision of the administrative law judge. The order of the Secretary shall be final and is not subject to judicial review." 50 U.S.C. app. § 2412(c)(1) (Supp. III 1985).

■ Thus, two EAA finality clauses now reinforce each other. Yet, taken together, these clauses bar judicial review only of "functions exercised under the Act" and of "orders" of the Secretary that "affirm,

modify, or vacate" the ALJ's initial decision. The question remains: Is review precluded when the Secretary exercises "functions" that are *not* specified "under the Act," e.g., when the Secretary issues an order that does *not* "affirm, modify or vacate" an ALJ decision? We conclude that review is available in these latter circumstances. We base our conclusion on the well-established presumption favoring judicial review and on the particular language, structure and legislative history of the EAA.

### A. *The Presumption Favoring Review*

" '[O]nly upon a showing of [ ]clear and convincing evidence[ ] of a contrary legislative intent should the courts restrict access to judicial review.' This standard has been invoked time and again when considering whether the Secretary has discharged 'the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision.' " *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 671–72, 106 S.Ct. 2133, 2136–37, 90 L.Ed.2d 623 (1986) (citation omitted) (quoting, respectively, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), and *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975)). Courts regularly invoke this presumption of judicial review when interpreting the particular language of a finality provision.

■ If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims. Judicial review is favored when an agency is charged with acting beyond its authority. Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction. *See generally* L. Jaffe, *Judicial Control of Administrative Action* 327–36 (1965). The leading case is *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210

(1958), in which the Court found district court review proper, despite an express finality provision, where the National Labor Relations Board had acted "in excess of its delegated powers and contrary to a specific prohibition in the [NLRA]." *Griffith v. FLRA*, 842 F.2d 487, 492 (D.C. Cir.1988). The *Leedom v. Kyne* test for whether an agency has acted "in excess of its delegated powers" has been alternatively phrased as whether the agency action "on its face" violated a statute. In *Oestereich v. Selective Service System Local Bd. No. 11*, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed. 2d 402 (1968), for example, the Court disregarded an explicit preclusion of pre-induction review in order to reverse plaintiff's draft classification. As a divinity student, plaintiff was entitled to a statutory exemption from the draft—an exemption that the *Oestereich* majority described as "plain on the record and on the face of the Act." *Id.* at 238 n. 7, 89 S.Ct. at 417 n. 7. Justice Harlan used similar language in his concurrence, finding judicial review appropriate where a draft "registrant contends that the procedure employed by the [Selective Service] Board is *invalid on its face.*" *Id.* at 241, 89 S.Ct. at 418 (emphasis added). *See also Fein v. Selective Service System Local Bd. No. 7*, 405 U.S. 365, 374–75, 92 S.Ct. 1062, 1069, 31 L.Ed.2d 298 (1972) (distinguishing those cases in which the Court has followed *Oestereich* as cases where "administrative action, based on reasons unrelated to the merits of the claim to exemption or deferment, deprives the registrant of the classification to which, otherwise and concededly, he is entitled by statute").

The significance of both the labor board and selective service cases was duly noted by this court in *Ralpho v. Bell*, 569 F.2d 607 (D.C.Cir.1977). That decision upheld jurisdiction (despite a finality clause in the statute) to review plaintiff's allegation that the Micronesian Claims Commission had processed his claim in derogation of its own regulations and of the law governing the United States' trusteeship of Micronesia. The court discerned, in *Kyne, Oestereich* and their progeny, a "judicial disinclination to infer that Congress wished to insulate plain statutory violations from review." *Id.* at 623.

> In neither [line of cases] ... was the demarcation of reviewability set by the Court [i.e. between "facial" and other statutory violations] adumbrated by Congress. Rather, Congress had expressed an unqualified intent to shut off review, to which exception was made on grounds that the legislature would not be deemed to have barred judicial comparison of agency action with plain statutory commands unless such a ban was clearly articulated.

*Id.* at 624.

We find substantial similarity between these precedents and the case *sub judice.* As with the statutory exemption that was denied to a draft registrant in *Oestereich,* or the NLRB's failure to conduct a required poll of bargaining unit members in *Kyne,* Dart's claim of agency error rests on an assertion about the plain requirements of the EAA: that the statutory authority to "modify" an ALJ decision regarding export sanctions does not include the power to *reverse* that decision. Also, like the finality clauses in the selective service law and the NLRA, the EAA's finality language (foreclosing court challenges to "functions exercised" or "orders" issued under the Act) is general in its terms but not explicitly inclusive. Because this finality clause does not expressly extend to claims that an agency "facially" violated its statute, *Ralpho* and *Griffith* suggest that review of such claims should not be precluded.

In *Kyne, Oestereich* and their progeny, courts have cited two factors to support the inference that Congress did not preclude review of "facial" violations. First, courts presume that one motive for imposing finality is to spare the courts a flood of lawsuits. "Facial" violations of statutes, however, are infrequent and typically raise issues—unrelated to the facts of the particular cases—that need only be resolved by the courts once. Accordingly, courts can review alleged violations of this sort, while still preserving the finality that Congress sought in the vast majority of cases. The

Supreme Court noted this factor when it recently upheld review of a Medicare regulation, despite an unambiguous finality provision. *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. at 680 n. 11, 106 S.Ct. at 2141 n. 11 (" 'permitting review only [of] a statutory or administrative standard would not result in a costly flood of litigation, because the validity of a standard can be readily established, at times even in a single case' " (quoting Note, 97 Harv.L.Rev. 778, 792 (1984) (footnote and ellipses omitted))). *See also Johnson v. Robison,* 415 U.S. 361, 370, 94 S.Ct. 1160, 1167, 39 L.Ed.2d 389 (1974) (same rationale for reviewing constitutional challenge to statute); *cf. Carter v. Cleland,* 643 F.2d 1, 9 (D.C.Cir.1980) (finding that a finality clause did preclude jurisdiction because "[a]ppellants do not ask us to consider a one-time question of statutory interpretation regarding the scope of the Administrator's authority ... [but rather] ask us to find that the statute's requirement of case-by-case determinations of fault was not met here").

Dart's claim that the Secretary of Commerce lacks authority under the EAA to reverse an ALJ decision is like the challenge to the Medicare regulation in *Michigan Academy:* it is a discrete issue, unrelated to the facts of the case, that only needs to be resolved once. Thus, in granting review, we are unlikely to open the floodgates to litigation and thereby undermine Congress' intent that "orders" properly issued under the statute be final. *See Traynor v. Turnage,* — U.S. ——, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (noting that, in those circuit courts that have upheld review of veterans' benefits regulations despite a statute precluding review of benefit "determinations," few challenges to regulations have actually been filed).

There is a second and closely related reason why the presumption of judicial review is particularly strong where an agency is alleged to have acted beyond its authority. When Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced. As the Supreme Court long ago observed,

> The responsibility of determining the limits of statutory grants of authority ... is a judicial function entrusted to the courts by Congress.... [U]nder Article III, Congress established courts to adjudicate cases and controversies as to claims of infringement of individual rights whether by unlawful action of private persons or by the exertion of unauthorized administrative power.

*Stark v. Wickard,* 321 U.S. 288, 310, 64 S.Ct. 559, 571, 88 L.Ed. 733 (1944). The Court reaffirmed this principle very recently in *Michigan Academy:* "We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." 476 U.S. at 681. *See also Leedom v. Kyne,* 358 U.S. at 190, 79 S.Ct. at 185 (concluding that Congress favors "judicial protection of rights it confers against agency action taken in excess of its powers").

This principle fully applies to the present case, since Dart contends that Congress withheld from the Secretary the power to reverse an ALJ's decision regarding export sanctions. As we explain below, we agree that Congress purposefully limited the Secretary's authority in this respect, as part of its larger effort to augment procedural protections for alleged EAA violators. Absent a clear indication to the contrary, the logical inference is that Congress expected courts to enforce this limitation on administrative power. Especially is this so where the administrative power can destroy—as appellant asserts it will in this case—an individual's livelihood. "An unlimited administrative authority to determine the limits of its power may be tolerable in the area of government grant (pension, etc.) but not in areas in which administrative power reaches out against the individual...." L. Jaffe, *Judicial Control of Administrative Action* 355 (1965) (footnote omitted).

### B. *The Scope of Judicial Review Under the EAA*

Having determined that the presumption of judicial review applies with special force

to this case, we turn to the clause itself and its legislative origins. "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history and the nature of the administrative action involved." *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984). Examining these factors, we find no "clear and convincing evidence" that Congress foreclosed our jurisdiction over Dart's claim.

### (1) *Section 13(a)*

As we have already noted, the EAA's first finality clause (section 13(a)) exempts "functions exercised under the Act" from the judicial review provisions of the Administrative Procedure Act. *See* 50 U.S.C. app. § 2412(a) (Supp. III 1985). Thus, instead of directly barring review of all export control decisions, the statute only makes the APA's guarantee of judicial review inapplicable to EAA "functions." This indirect approach is noteworthy. It suggests that Congress was mainly concerned about prolonged appeals of claims on the merits but did not necessarily bar review when the Secretary acts beyond his proper "functions." Prior to the APA's enactment, after all, courts had recognized the right of judicial review of agency actions that exceeded authority. *See, e.g., American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 110, 23 S.Ct. 33, 39, 47 L.Ed. 90 (1902) (upholding jurisdiction over claim that a postmaster acted *ultra vires*; "[o]therwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law").

Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. To be sure, the APA states that judicial review is not available "to the extent that statutes preclude [it]." 5 U.S.C. § 701(a)(1) (1982). But, this serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review. It does not repeal the

review of *ultra vires* actions that was recognized long before, in *McAnnulty.* Indeed, the Senate Judiciary Committee explained the APA clause that withdraws judicial review in these terms: "It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified." S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945) (committee report accompanying the APA); *see also* H.R.Rep. No. 1980, 79th Cong., 2d Sess. 41 (1946) (identical language).

Purged of its awkward locution, the Senate Judiciary Committee's statement boils down to this: the Veterans' Administrator cannot issue oil drilling permits—nor can the Secretary of Labor rescind television licenses—and expect to escape judicial review by hiding behind a finality clause. Were such unauthorized actions to go unchecked, chaos would plainly result. When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority. Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior, and we find no evidence that Congress has done so under the EAA. Of course, one can *read* the EAA's first finality clause as having a greater preclusive effect than we give it. But in view of the strong presumption favoring review, especially where "the activities of an agency are facially invalid," *Ralpho v. Bell,* 569 F.2d at 623, we look for more explicit congressional intent before inferring that all review is cut off.

The Supreme Court's recent opinion in *Lindahl v. OPM,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), lends support to our parsing of the EAA's first finality clause. In *Lindahl,* the Court confronted preclusion language that is far stronger than section 13(a) of the EAA. Under the Civil Service Retirement Act, decisions by the Civil Service Commission on "questions of dependency and disability ... shall be final and conclusive and shall not be subject to review." 5 U.S.C. § 8347(c) (1982). Nevertheless, the *Lindahl* Court found the scope of this preclusion uncertain; the

Court inferred from surrounding statutory language that finality might only extend to the Civil Service Commission's factual, but not its legal, conclusions. 470 U.S. at 779, 105 S.Ct. at 1627. Petitioner alleged that rejection of his disability claim violated applicable regulations. Underscoring the fact that " 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review,' " *id.* at 778, 105 S.Ct. at 1626 (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)), the Court upheld jurisdiction.

The *Lindahl* Court further noted that "when Congress intends to bar judicial review altogether, it typically employs language far more unambiguous and comprehensive than that set forth in [the Civil Service law]." 470 U.S. at 779–80, 105 S.Ct. at 1627. One of the Court's examples of more sweeping preclusion language was the finality clause in the veterans' benefits law. That clause provides that

> decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits ... shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

38 U.S.C. § 211(a) (1982). Despite this emphatic wording, several Circuits have held that section 211(a) permits review of regulations that allegedly violate the veterans' benefits statute. *See Kirkhuff v. Nimmo,* 683 F.2d 544, 547 (D.C.Cir.1982) (cases cited therein). Indeed, our own court has left open this possibility. *See McKelvey v. Turnage,* 792 F.2d 194, 198 & n. 1 (D.C.Cir.1986), *aff'd sub nom. Traynor v. Turnage,* —— U.S. ——, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988). Whatever the reviewability of Veterans' Administration decisions, section 211(a)'s finality clause stands in sharp contrast to the language of the EAA. We believe the EAA's finality clause permits review of agency actions that exceed statutory authority.

Section 13(a)'s sparse legislative history does not contradict our analysis of its text. The clause was first enacted in 1949, when Congress extended export control provisions first adopted as emergency measures during World War II. *See* Pub.L. No. 76–703, § 6, 54 Stat. 712, 714 (1940). One of the 1949 committee reports explained that enforcement decisions were to be exempt from the APA "in view of the temporary character of this legislation and its intimate relation to foreign policy and national security." S.Rep. No. 31, 81st Cong., 1st Sess. 6 (1949). The report also assured senators that the APA provisions could be dispensed with because "[t]he essential safeguard[ ] of ... an opportunity to be heard on appeal from hardship, [is] obtained through ... existing agency procedures for review and appeals from licensing and compliance actions." *Id.* at 6–7.

Like the wording of the statute, the significance of this legislative history is somewhat ambiguous. The fact that the finality clause was temporary could mean that Congress was briefly willing to eliminate review even of "facial" statutory violations. On the other hand, the fact that the export control law was considered a foreign policy imperative—part of this nation's response to the growing Cold War—suggests that Congress' main concern was that the policy be effectively implemented. That concern could be met without barring review of agency actions that exceed authority. Congress may simply have sought to insulate licensing determinations from lengthy reexamination in the courts. (It bears repeating that the EAA's first finality clause covers *all* "functions exercised under the Act," and not merely enforcement decisions.)

As between these two views of Congress' legislative purpose, we find no "clear and convincing evidence" to support the first interpretation and, in fact, we find the second interpretation more plausible. To begin with, though conceived as a temporary measure, the export control law was repeatedly extended. Yet, in none of these reauthorizations did Congress alter the scope of the finality clause—something which it might be expected to have done if

it initially cut off *all* review and did so as a temporary expedient. Secondly, when the export control law was amended in 1965 to clarify the procedure for civil fines, Congress required the Department to collect such penalties through a court suit. In those suits, courts were given the right to review *de novo* "all issues necessary to the establishment of liability." Export Control Act of 1965, Pub.L. No. 89–63, § 2, 79 Stat. 209 (1965).

Of course, collection actions differ from administrative decisions imposing sanctions, in that the Secretary must call upon the enforcement powers of the courts. The provision for *de novo* review, therefore, may simply reflect solicitude for judicial integrity. *See, e.g.,* L. Jaffe, *Judicial Control of Administrative Action* 384–85 (1965). Nevertheless, the protection of EAA violators in collection actions makes it doubtful that Congress foreclosed review of agency misconduct in all other cases simply because the penalties in those cases were *non* monetary. Such a result would be "quite unlikely," as the American Bar Association points out in its *amicus* brief supporting Dart's appeal, because the denial of export privileges is "a considerably more Draconian sanction [than fines,] since it may totally destroy an individual's livelihood." Brief of *amicus curiae* at 18.

A final aspect of the legislative history supports our view that section 13(a) permits limited judicial review. During Congress' attempt to reauthorize the EAA in 1984, Senator Dixon offered an amendment extending judicial review to all enforcement decisions. The terms of this amendment are crucial to Dart's claim that the Secretary exceeded his authority, and we therefore examine the amendment's text at a later point. The debate on the Dixon amendment, however, sheds further light on Congress' intent as to judicial review. Senator Dixon conceded that, if the Senate rejected his amendment, there remained

> a type of review available even though the courts are specifically barred from reviewing Export Administration Act related matters. A court always has the ability to review constitutional issues, including constitutional due process issues.

In all probability, the Federal courts can also review a party's contention that the Department acted without statutory authority.

130 Cong.Rec. S1703 (daily ed. Feb. 27, 1984).

Of course, one senator's statement need not reflect more widely held views, but there are indications that this statement did. In the first place, the Dixon amendment was the product of consultation among the Commerce and Justice Departments, the "business community" and several senators. *Id.* at S1702 and S1704 (remarks of Sen. Dixon and Sen. Heinz, respectively). Thus, Senator Dixon's understanding of existing law was unlikely to be an isolated view. In addition, the House–Senate conference report described the Dixon amendment as "authorizing court review on procedural and factual grounds of the Secretary's [enforcement] actions." 130 Cong.Rec. H12156 (daily ed. Oct. 11, 1984) (reprinting conference report to the Export Administration Act Amendments of 1984). The Dixon amendment actually specified review of legal findings, as well. The phrasing of the report language suggests, therefore, that the amendment only changed existing law insofar as it extended review to "procedural and factual" errors. Implicitly, clear legal errors were already reviewable.

In sum, we do not find in the wording, the purpose, or the legislative history of section 13(a) the "clear and convincing evidence" that Congress intended to cut off all judicial review of EAA enforcement decisions. Rather, each of these factors is consistent with our reading of the finality clause as permitting review of agency actions that, on their face, violate the EAA.

#### (2) *Section 13(c)*

Senator Dixon's attempt to expand judicial review of enforcement decisions spawned the EAA's second finality clause. After the Senate adopted the Dixon amendment, the House conferees accepted that portion of the amendment that augmented protections for alleged EAA violators with-

in the agency's own proceedings. But the conferees deleted the provision for judicial review. As revised, the Dixon amendment read in pertinent part:

The Secretary shall, in a written order, affirm, modify, or vacate the decision of the administrative law judge within 30 days after receiving the decision. The order of the Secretary shall be final and is not subject to judicial review.

130 Cong. Rec. H12139 (daily ed. Oct. 11, 1984) (reprinting the conference report on the Export Administration Act Amendments of 1984). Congress failed to take final action on this conference version before the session adjourned but enacted the same language early in the following year, adding a section 13(c) to the EAA. *See* P.L. 99–64, § 114, 99 Stat. 120, 150–51 (1985) (codified at 50 U.S.C. app. § 2412(c) (Supp. III 1985)).

By proclaiming enforcement orders "not subject to judicial review," section 13(c) threatens a greater preclusive effect than does section 13(a), which merely exempts EAA "functions" from the APA. It is doubtful, however, that section 13(c) really does go further than its precursor. The House–Senate conference report, for example, asserted that section 13(c)'s "effect ... is to render such decisions final, *as they are under current law.*" 130 Cong. Rec. H12156 (daily ed. Oct. 11, 1984) (emphasis added). (And, it is this same section of the conference report that suggests the "decisions" made final are merely the "procedural and factual grounds of the Secretary's [enforcement] actions.")

Even if we believed that section 13(c) expanded preclusion beyond that required by section 13(a), we would still uphold jurisdiction in this case. The reason stems from the particular nature of Dart's claim. The "orders" that section 13(c) commands "not [be] subject to judicial review" are the same orders that are required (again, by section 13(c)) to "affirm, modify, or vacate the decision of the administrative law judge." 50 U.S.C. app. § 2412(c) (Supp. III 1985). Because we agree with Dart that the Secretary's order against him did *not* "affirm, modify or vacate" the ALJ's deci-

sion, we conclude that it is not among the "orders" placed beyond review by section 13(c)'s finality provision.

Our conclusion that section 13(c) permits review of Dart's claim is consonant with the trial judge's own view in this case. To be sure, Judge Greene invoked the EAA's finality clause as a ground for dismissing Dart's appeal. But he acknowledged that review would be available "if there has been 'a ... misconstruction of the governing legislation, or some like error going to the heart of the administrative determination.'" *Memorandum Opinion* at 3 (quoting *Lindahl v. OPM,* 105 S.Ct. at 1628). It was only because he did not believe the Secretary had exceeded his authority (a point on which, as we explain below, we disagree) that the trial judge ultimately dismissed Dart's claim.

Judge Greene's view that the EAA does not preclude review of "facial" violations became more explicit in an opinion issued two months after his ruling in this case. So far as we know, *Spawr Optical Research, Inc. v. Baldrige,* 649 F.Supp. 1366 (D.D.C.1986), *appeal docketed,* No. 87–5033 (D.C.Cir. Jan. 29, 1987), is the only published federal court decision to have construed the preclusive scope of section 13(a) and (c). The plaintiff in *Spawr* contended that his rights under the EAA had been plainly violated when the ALJ imposed sanctions without a hearing. "Were the Court to decline to reach the merits of this claim," Judge Greene held, "it would grant the Secretary unlimited and unreviewable discretion to deny those crucial procedures that Congress has written into this Act. The Court declines so to construe the statute, and it concludes that it has jurisdiction to review plaintiffs' claim." 649 F.Supp. at 1369. Dart asserts that the Secretary committed the same sort of statutory violation against him that *Spawr* declares should not escape review. It remains, then, for us to examine the lower court's decision as to the substance of Dart's claim.

C. *Whether the Secretary Exceeded His Authority*

█ Section 13(c) of the EAA sets forth the procedural protections afforded alleged

EAA violators during the Department's enforcement proceedings. As noted, these protections culminate in the requirement that ALJ decisions be forwarded to the Secretary and that "[t]he Secretary shall, in a written order, affirm, modify, or vacate" them. 50 U.S.C. app. § 2412(c)(1) (Supp. III 1985). Dart contends that the words "modify" and "vacate" are to be given their plain, common sense meaning and that they therefore act as a constraint upon the Secretary's appellate review. The Secretary, in other words, cannot reverse the ALJ. We agree that "the starting point for interpreting a statute is the language of the statute itself, ... [which] must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). "[U]nless contrary indications are present, a court can assume that Congress intended the common usage of a term to apply." *Inner City Broadcasting Corp. v. Sanders*, 733 F.2d 154 (D.C.Cir.1984).

It is clear that the common usage of the word "modify" does not describe the Secretary's action in this case. The dictionary's first meaning of "modify" is: "to make more temperate and less extreme." *Webster's Third New International Dictionary* 1452 (Merriam–Webster ed. 1981). At most, the word means "to make a basic or important change in." *Id.* (fourth definition). In this case, the Secretary did not "temper" or even "make a basic change in" the ALJ's decision. Rather, he completely overturned the ALJ's conclusion that Dart did not know that licenses were needed for the polishers. The Secretary found that Dart *did* know and was therefore subject to sanctions. We cannot imagine a legal action that comports more fully with the common usage of the term "reverse": "to overthrow (a legal decision) by a contrary decision" and "to take an opposite stand from that formerly held." *Id.* at 1943 (parentheses in original). The plain language of the EAA suggests, therefore, that Congress did not give the Secretary the power that he exercised against Dart.

On appeal, the government assails this "strained reading of the governing statutory provisions," which it says "ascribes to Congress an intent bordering on the irrational." Appellees' brief at 30. We note, however, that in the earlier stages of this case the Department paid more heed to section 13(c)'s plain meaning. In its appeal from the ALJ's initial decision, for example, the Department carefully avoided the word "reverse," arguing that the Secretary possessed the power to "vacate" the ALJ's ruling and then to "enter a [contrary] Decision and Order." J.A. at 53, 59–60. The Assistant Secretary evidently doubted that the power to "vacate" stretched so far. Like the Department's counsel, however, he avoided the term "reverse," styling his decision instead as an effort to "modify" the ALJ's order. Josef Kubicek, *et al.*, 51 Fed.Reg. 25,080 (1986).

The trial judge in this case recognized that the words "vacate" and "modify" signified something distinct from "reverse." He found, however, "no basis for believing that the terms [in the EAA] ... do not authorize the action taken in this case." In short, he doubted that Congress had made "a deliberate decision to constrain the Secretary of Commerce." *Memorandum Opinion* at 4. Our review of the legislative history convinces us otherwise.

The requirement that the Secretary's order "affirm, modify, or vacate" the ALJ's decision has its genesis in the Dixon amendment. Senator Dixon introduced that amendment as "an attempt to provide a small degree of fundamental due process and basic fairness to those accused of civil violations of the Export Administration Act." 130 Cong.Rec. S1702 (daily ed. Feb. 27, 1984) (statement of Sen. Dixon). The crux of Senator Dixon's concern was that "the treatment of civil violators of the [EAA] is far different than applies in most other areas of Federal law.... [T]he Commerce Department essentially gets to act as prosecutor, judge, and jury, with essentially no right of independent judicial review." *Id.* Senator Dixon especially criticized the use of hearing commissioners, rather than the more independent ALJs, to preside over the initial enforcement proceedings—as well as the absence of basic

procedural guarantees at those hearings. The floor manager of the trade bill endorsed the amendment, agreeing that "the act before us does provide for very strong civil sanctions ... [and] it is important that along with those strong sanctions there be adequate safeguards against abuse." *Id.* at S1704 (statement of Sen. Heinz).

As adopted by the Senate (and as later incorporated into the law) the Dixon amendment substantially changed enforcement proceedings. Officials presiding over the sanctions hearings were upgraded to administrative law judges. Accused EAA violators were given the right to "submit a response to the complaint, including briefs and other supporting materials," to "present and cross-examine relevant witnesses," to "orally argue [the] case in recorded proceedings," and to receive "findings of fact and conclusions of law in a written decision." *Id.* at S1702. Finally, such decisions are to be "referred to the Secretary," who "shall, in a written order, affirm, modify, or vacate the decision." *Id.* The fact that the ALJ must issue a "decision," while the Secretary may *dispose of* the case with an "order," makes it all the more likely that the Secretary's power to "affirm, modify, or vacate" does not encompass the power to "reverse" the ALJ's result. *Compare* 28 U.S.C. § 2106 (1982) (specifying that a federal appellate court "may affirm, modify, vacate, set aside *or reverse* any judgment, decree, or order of a court lawfully brought before it for review" (emphasis added)).

The most significant indicium of congressional intent, however, may not be the Dixon amendment's own language. The administrative backdrop to Senator Dixon's efforts is at least as revealing. As Dart points out, the Commerce Department's practice at the time that Congress adopted the Dixon amendment permitted the Secretary to reverse a hearing commissioner's initial decision in enforcement cases. In fact, regulations specified that the Secretary could "dispose of the case by affirming, modifying, or *reversing* the order of the presiding official or [could] refer the case back to the presiding official for further proceedings." 15 C.F.R. § 388.22(e)

(1985) (emphasis added) (revised Dec. 30, 1985). This sheds much light on Congress' subsequent action.

"Congress is presumed to be aware of an administrative or judicial interpretation of the statute ...," *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978), and statutes "will be interpreted on the assumption that ... if a change occurs in legislative language a change was intended in legislative result." 2A N. Singer, *Sutherland Statutory Construction* § 45.12 (4th ed. 1984). The architects of the Dixon amendment consulted with the Department at some length, and they were doubtless aware of the regulations. It is reasonable to conclude that Congress consciously chose wording in its 1985 EAA amendment that diverged from those regulations. "We are entitled to assume that in amending [a statute], Congress legislated with care." *Palmore v. United States*, 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed. 2d 342 (1973).

For its part, the Department clearly recognized the amendment's significance. The Secretary issued new regulations confining his decisions, in enforcement proceedings like the one in this case, to orders "affirming, modifying, or vacating the recommended decision" of the ALJ. *See* 50 Fed.Reg. 53,144 (1985) (codified at 15 C.F. R. § 388.23(c) (1987)).

This history makes clear that the distinction between "reverse," on the one hand, and "modify" or "vacate," on the other, represents far more than a quibble about semantics. From a practical standpoint, it means the difference between a civil sanction that is based on a full hearing and one that is not. It means the difference between a decision that grapples with the facts developed in that hearing and a decision—like the Assistant Secretary's terse, conclusory reversal in this case—that is devoid of factual moorings. It means the difference between a decision by an adjudicatory official with independent status, who saw the witnesses' demeanor and gauged their truthfulness, and a decision by someone who is an official of the prosecuting agency and who saw only a paper

record. These are not trivial distinctions. Indeed, courts assume the importance of such distinctions every day. Rarely if ever would an appellate court reverse a judgment that was in a defendant's favor and impose a judgment against him, without remanding the matter to the district court. Yet, that is precisely what the Secretary of Commerce did in Dart's case.

We believe the EAA does not permit such a result. As the history of the Dixon amendment demonstrates, Congress clearly was concerned about the dangers of having an agency prosecute a case for sanctions before officials of the same agency; it was also concerned that sanction proceedings lacked procedural fairness. Congress' response to these twin problems was to insulate the primary decisionmaker from the agency (by inaugurating the use of ALJs) and to augment the procedural guarantees for alleged EAA violators.

Imposing these reforms at the initial stage of the enforcement proceedings would have been pointless if the decision rendered by the reformed process could, at the next stage of review, be entirely reversed by the Secretary. The logical conclusion is that Congress deliberately limited the Secretary's review of ALJ rulings: he may only "affirm, modify, or vacate" such decisions. A contrary reading of the statute—permitting the Secretary to impose a result diametrically opposed to the ALJ's decision—would produce a far less coherent administrative scheme. *See* 2A N. Singer, *Sutherland Statutory Construction* § 45.12 (4th ed. 1984).

There remains one final argument in defense of the Secretary's action, which the trial judge embraced in his decision. "[I]n federal administrative law practice," Judge Greene observed, "the agency generally has full authority to overturn an ALJ's ruling." *Memorandum Opinion* at 5. Section 557 of the APA embodies this principle. Along with its procedural requirements for fair hearings, section 557 provides that, when an agency reviews the initial decision by a hearing officer, it "has all the powers it would have in making the initial decision." 5 U.S.C. § 557 (1982).

Judge Greene pointed out that the EAA requires all enforcement "proceedings" to be conducted in accordance with section 557. *Memorandum Opinion* at 4. He inferred from this that the Secretary of Commerce could exercise "all the powers" that the ALJ possessed "in making the initial decision." A close reading of the EAA, however, suggests that section 557 plays a much more limited role in enforcement actions under the EAA. Section 13(c) of the EAA provides that, *"[s]ubject to the provisions of this subsection,* any *hearing* shall be conducted in accordance with sections 556 and 557 of [the APA]."* 50 U.S.C. app. § 2412(c)(1) (Supp. III 1985) (emphasis added).

Even if we disregard this clause's introductory phrase, we doubt that the clause reinstates those aspects of section 557 (e.g., the provision permitting agencies to reverse initial decisions) that do not apply to *hearings.* But our doubt becomes certainty in view of the clause's introductory phrase. According to that phrase, section 557 applies to enforcement proceedings only to the extent it is not inconsistent with the rest of section 13(c). And since section 13(c) limits the Secretary to affirming, modifying or vacating initial decisions, section 557 only applies "subject to th[at] provision[ ]." Thus, the Secretary cannot claim any independent authority for reversing ALJ decisions from section 557.

There is a more fundamental problem with Judge Greene's reliance on section 557. That section operates within the larger framework of the Administrative Procedure Act. Thus, its grant to agencies of "all the powers[, when reviewing a case, that they] would have in making the initial decision" must be read in the context of the APA's other procedural safeguards. For example, final agency decisions are normally subject to judicial review. *See* 5 U.S.C. §§ 702, 704 (1982). And the reviewing court must give weight to an ALJ's initial decision when determining whether an agency's reversal of the ALJ was permissible. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 495, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951). The APA also re-

quires that agency adjudications like the one in this case "include a statement of [ ] findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c) (1982).

None of these other APA safeguards is present in this case. In particular, the Secretary's one-page order reversing the ALJ decision clearly flunks the statutory test for reasoned decisionmaking. An agency must "make findings that support its decision ... [and] articulate a[ ] rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962). The Secretary made no such findings here. By relying on section 557 to authorize the Secretary's action against Dart, the trial judge gave the agency the benefit of one clause in the APA—even though the Secretary's action did not comply with other APA requirements. Such selective application of the APA is inappropriate, for it undermines protections for the individual citizen that were elsewhere included in that carefully balanced statute.

## III. Conclusion

In drafting the EAA's enforcement provisions, Congress steered a path between two competing concerns: the need to protect national security by controlling exports of advanced technology and the need to treat individuals fairly in the administrative process. We find that Congress struck the balance in favor of a greater degree of fairness than either the Department or the trial court recognized.

The EAA no longer gives the Secretary power to reverse an ALJ's decision as to sanctions. Therefore, the Secretary's order against Dart—imposing $150,000 in fines and barring all export privileges for 15 years—cannot stand. Though issued in the guise of a modification, the order clearly reversed the ALJ's key findings and thus exceeded the Secretary's authority. The result was a denial of the procedural protections that Congress expressly extended to accused EAA violators—namely,

a determination regarding civil sanctions that is firmly grounded in a required hearing and that is justified in terms of the evidence adduced therein. Without examining the merits of the Secretary's determination, we conclude that the order "on its face" violated the EAA. We also find that Congress has permitted judicial review of such "facial" violations.

We acknowledge that the exception for review of facial violations should remain narrow. Congress' finality clause must be given effect, and an agency action allegedly "in excess of authority" must not simply involve a dispute over statutory interpretation or challenged findings of fact. As this court recently held in a labor law context, "[t]he invocation of *Leedom v. Kyne* jurisdiction is extraordinary; to justify such jurisdiction, there must be a 'specific provision of the Act which, although it is [ ]clear and mandatory,[ ]' was nevertheless violated." *Council of Prison Locals v. Brewer,* 735 F.2d 1497, 1501 (D.C.Cir. 1984) (citation omitted). We find, however, that the requirement that the Secretary of Commerce "affirm, modify or vacate" ALJ enforcement decisions *is* "clear and mandatory and was nevertheless violated."

Accordingly, we reverse the trial judge's dismissal with instructions that the Secretary's decision be vacated and that the case be remanded. The Secretary has yet to exercise those options (i.e. to affirm, modify or vacate the ALJ decision) that are delegated to him under the EAA. Dart's request for mandamus, however, is not inconsistent with that prospect. " '[E]ven in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated.' " *American Cetacean Society v. Baldrige,* 768 F.2d 426, 434 (D.C.Cir. 1985) (citation omitted), *rev'd on other grounds sub nom. Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (Secretary did not act beyond his discretionary authority in this instance). We thus

remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*