United States Court of Appeals,

Fifth Circuit.

Nos. 96-20582, 96-60154.

KIRBY CORPORATION, Plaintiff-Appellant,

v.

Federico F. PEÑA, Secretary of Transportation;  Albert J. Herberger, Admiral, Defendants-Appellees,

Hvide Van Ommer I Hvide Van Ommeren Tankers I LLC;  Hvide Van Ommer II Hvide Van Ommeren Tankers II LLC;  Hvide Van Ommer III Hvide Van Ommeren Tankers III LLC;  Hvide Van Ommer IV Hvide Van Ommeren Tankers IV LLC;  Hvide Van Ommer V Hvide Van Ommeren Tankers V LLC, Intervenor Defendants-Appellees.

KIRBY CORPORATION, Petitioner,

v.

UNITED STATES of America;  United States Department of Transportation, Maritime Administration, Respondents,

Hvide Van Ommeren Tankers, I LLC;  Hvide Van Ommeren Tankers, II LLC;  Hvide Van Ommeren Tankers, III LLC;  Hvide Van Ommeren Tankers, IV LLC;  Hvide Van Ommeren Tankers, V LLC, Intervenors.

April 9, 1997.

Appeal from the United States District Court for the Southern District of Texas.

Petition for Review of the Decision of the United States Department of Transportation, Maritime Administration.

Before DAVIS and DUHÉ, Circuit Judges, and DOWD[1], District Judge.

DUHÉ, Circuit Judge:

Petitioner-Appellant Kirby Corporation challenges a Maritime Administration decision granting Title XI shipbuilding loan guarantees to Intervenor-Respondents Hvide Van Ommeren Tankers,

_____

[1]District Judge of the Northern District of Ohio, sitting by designation.

1

LLC. Kirby appeals the district court's order dismissing its suit for lack of jurisdiction, and also petitions this Court for direct review. We affirm the district court's decision and dismiss the petition.

BACKGROUND

I. FACTS

Title XI of the Merchant Marine Act of 1936, as amended, 46 U.S.C.App. §§ 1271-1280a, governs a federal loan guarantee program administered by the Maritime Administration ("MarAd") and designed to facilitate private investment in the construction of vessels and to revitalize the American merchant marine. Under the current statutory scheme, a shipowner finances vessel construction in the private market by issuing bonds or other indebtedness backed by federal guarantees supported by the full faith and credit of the United States. 46 U.S.C.App. §§ 1274(a), 1273(d). To protect its financial interests in the program, the federal government—after approving a loan guarantee for a prospective vessel—acquires a security interest in the vessel. 46 U.S.C.App. § 1273(b). If the vessel owner subsequently defaults on the loan, the government may either cure the default and assume the loan obligation or pay the entire principal and interest due, 46 U.S.C.App. § 1275, and then foreclose on its security interest in the vessel. 46 U.S.C.App. § 1275(c).

To qualify for a loan guarantee, a prospective vessel owner must meet certain requirements specified by Title XI and the accompanying MarAd regulations, see 46 U.S.C.App. § 1274(d)(1); 46

2

C.F.R. 298.10-298.14, including the requirement that a vessel owner be a United States citizen, which the regulations define by reference to section 2 of the Shipping Act of 1916, 46 U.S.C.App. § 802. *See* 46 C.F.R. 298.10. Pursuant to this definition, MarAd must find that each prospective vessel is at least 75% owned and controlled by United States citizens before guaranteeing a loan.

In May 1995, the Hvide Van Ommeren tanker companies (collectively, "Hvide") applied for Title XI loan guarantees to build five tankers to be used in the domestic coastwise trade. Upon learning of Hvide's application, Kirby Corporation ("Kirby"), a Houston-based company that owns and operates ocean-going tankers in the domestic coastwise trade, registered objections to the issuance of such guarantees with MarAd. Although MarAd has no formal administrative or adjudicative process by which it considers the comments of third parties, it nonetheless agreed to receive Kirby's comments and objections. Apparently not persuaded by Kirby's position, in February 1996, MarAd issued a "letter commitment" to guarantee approximately $216 million in financing for the Hvide tanker construction. In issuing this commitment, MarAd concluded that Hvide met, *inter alia,* Title XI's citizenship requirements. In March 1996, MarAd and Hvide closed the guarantee transaction, and a $216 million guaranteed bond offering was sold in the private market.

II. PROCEDURAL HISTORY

In January 1996—before MarAd issued a letter commitment to Hvide—Kirby sought a declaratory judgment and temporary restraining

3

order in the United States District Court for the District of Columbia. Kirby asked the district court to prohibit MarAd from issuing the commitment to Hvide until the court could determine whether MarAd's decision to issue a Title XI loan guarantee was subject to judicial review. The district court denied Kirby's request for injunctive relief, reasoning that Kirby had not established that it was likely to succeed on the merits because 46 U.S.C.App. § 1273(e) precluded judicial review. Shortly thereafter, Kirby voluntarily dismissed the District of Columbia suit.

On February 23, 1996, Kirby filed another complaint, this time in the United States District Court for the Southern District of Texas, challenging the Hvide loan guarantees under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Kirby argued that MarAd's decision to issue the letter commitment was arbitrary, capricious, an abuse of discretion, and contrary to law because the Hvide tanker construction project was not economically sound and because the Hvide companies did not meet the citizenship requirements. The district court, however, concluded that Congress, pursuant to § 1273(e), had foreclosed all judicial review of Title XI loan guarantee decisions. It therefore dismissed the suit for lack of subject matter jurisdiction. Kirby appeals that decision.

While the complaint in the Southern District of Texas was pending, Kirby also filed a petition for direct review in this Court. This petition alleges jurisdiction under the Hobbs Act, 28

4

U.S.C. § 2341 *et seq.,* and seeks a judgment reversing MarAd's citizenship decision.

We consolidated the district court appeal with the Hobbs Act petition.

ANALYSIS

I. PRECLUSION OF JUDICIAL REVIEW

The Administrative Procedure Act ("APA") confers a cause of action upon persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Kirby, as a putative competitor of Hvide, contends that it was adversely affected when MarAd issued Title XI loan guarantees for the building of Hvide's vessels. It maintains that the Hvide limited liability companies are not United States citizens eligible to participate in the coastwise trade. It thus asks this Court to set aside MarAd's loan guarantee decision as contrary to law. *See* 5 U.S.C. § 706(2)(A).

The APA, however, withdraws the cause of action if a statute precludes judicial review or if agency action is committed to agency discretion by law. 5 U.S.C. § 701(a). Because we believe that both the text of § 1273(e) and the purpose of Title XI, as evidenced by its legislative history, indicate that § 1273(e) precludes judicial review, we affirm the district court's dismissal of Kirby's suit and dismiss Kirby's petition for review.

*A. The Presumption Favoring Judicial Review*

There is a "strong presumption" that Congress intends there to be judicial review of administrative agency action, *see Bowen v.*

5

*Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986), and the government bears a "heavy burden" when arguing that Congress meant to prohibit all judicial review. *See Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975). Indeed, "only upon a showing of "clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs. v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

Nevertheless, the presumption favoring judicial review, "like all presumptions used in interpreting statutes, may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent." *Block v. Community Nutrition Inst.,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984). The presumption may also be overcome "by inferences of intent drawn from the statutory scheme as a whole." *Bowen,* 476 U.S. at 673 n. 4, 106 S.Ct. at 2137 n. 4. Further, the Supreme Court has "never applied the "clear and convincing evidence' standard" in a "strict evidentiary sense." *Block,* 467 U.S. at 350, 104 S.Ct. at 2456. Instead, the Court "has found the standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is "fairly discernible' in the statutory scheme." *Id.* at 351, 104 S.Ct. at 2456 (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 832, 25 L.Ed.2d 184 (1970)).

Thus, to determine whether § 1273(e) precludes judicial review, we look to the express language of that subsection, as well as the structure of Title XI and its legislative history. *See id.* at 345, 104 S.Ct. at 2453-54.

*B. The Text of § 1273(e)*

Section 1273(e) of Title XI provides, in pertinent part:

> Any guarantee, or commitment to guarantee, made by the Secretary under this subchapter shall be conclusive evidence of the eligibility of the obligations for such guarantee, and the validity of any guarantee, or commitment to guarantee, so made shall be incontestable.

46 U.S.C.App. § 1273(e). The Government (and Hvide) argue that this subsection precludes all judicial review. Kirby asserts, however, that § 1273(e) bars only the *government,* as the issuer of the loan guarantees, from disavowing liability for validly entered loan commitments; *i.e.,* Kirby contends that once the government commits to guaranteeing a loan, § 1273(e) divests it of certain defenses in a suit to enforce the loan guarantee.

Kirby presents two textual arguments in support of its position. First, it maintains that the plain language of § 1273(e) does not expressly preclude judicial review because that section does not mention jurisdiction, courts, or judicial review. In light of the well-known presumption favoring review of agency action, Kirby insists that when Congress truly wishes to preclude judicial review, it expresses its intent in clear and unequivocal terms. *See Lindahl v. Office of Personnel Management,* 470 U.S. 768, 779-80, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985) ("[W]hen Congress intends to bar judicial review altogether, it typically

7

employs language far more unambiguous and comprehensive than that set forth in [the relevant statute]."); *Dart v. United States,* 848 F.2d 217, 221 (D.C.Cir.1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims.").[2] That Congress did not mention judicial review in § 1273(e), Kirby maintains, is strong textual evidence that Congress did not intend to insulate MarAd's decisionmaking from judicial review. Moreover, Kirby contends that even when the plain language of a statute does appear to preclude judicial review, courts have found that only some types of judicial review are barred. *See, e.g., Lindahl,* 470 U.S. at 771, 800, 105 S.Ct. at 1623, 1638 (holding that the relevant statute barred review of factual determinations but permitted review for alleged errors of law and procedure).

Kirby also maintains that § 1273(e), given its legal meaning, bars only the government, as the issuer of the loan guarantees, from revoking its loan guarantee commitments. Kirby derives this interpretation by analogy to "incontestability" provisions found in insurance contracts containing language similar to that found in § 1273(e). When construed as part of an insurance contract, an incontestability clause precludes insurers, after a given period of time, from invoking certain defenses to a suit on the policy by the

---

[2]By way of contrast, Kirby cites to statutes containing provisions that explicitly bar judicial review. *See, e.g.,* 38 U.S.C. § 511(a) (regarding veteran's benefits: "[T]he decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.").

8

insured.  *See* 1A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 311, at 306 (1981);  *see also* Black's Law Dictionary 766 (6th ed.1990).  Further, Title XI was initially a government loan *insurance* program when Congress first enacted and amended the predecessor to § 1273(e).  Completing the analogy, Kirby thus maintains that the incontestability clause found in § 1273(e) was designed to bar only the government, as the insurer of the shipbuilding loans, from revoking its insurance commitment. Therefore, it was not designed, Kirby contends, to address third-party challenges to loan guarantee decisions such as the one Kirby has brought.

It is true that when Congress wishes to preclude judicial review, it usually says so in clear and unequivocal terms. Further, the incontestability provision found in § 1273(e) is so similar to those provisions found in insurance contracts that Congress may have adopted such a provision with insurance-related incontestability clauses in mind, especially because Title XI began as a government insurance program.  Nevertheless, we are unpersuaded by Kirby's textual argument.

First, the plain language of the statute evinces Congress's intent to preclude judicial review.  In its customary legal usage, "conclusive evidence" means "[t]hat which is incontrovertible, either because the law does not permit it to be contradicted, or because it is so strong and convincing as to overbear all proof to the contrary...."  Black's Law Dictionary 290 (6th ed.1990). Further, in addition to its meaning in connection with insurance

9

policies, "incontestable" means that which is "not subject to being disputed, called into question, or controverted." Webster's Third New International Dictionary 1145 (unabridged ed.1981). That Congress may have patterned § 1273(e) after a clause typically found in insurance contracts that prevents insurers from disclaiming liability does not mean *ipso facto* that Congress intended to prevent *only* the government, as the insurer of shipbuilding loans, from disavowing such commitments. Nowhere does the plain language of § 1273(e) suggest that loan guarantees are incontestable only when challenged by the government.

We are also not persuaded by Kirby's citation to *Lindahl* or other such cases holding that language appearing to bar judicial review precludes only certain categories of agency determinations. Those cases merely illustrate the presumption of reviewability, and their holdings were based not only upon the text of the relevant statute, but also upon congressional intent as determined by the statutory schemes and legislative histories. *See, e.g., Lindahl,* 470 U.S. at 781-88, 105 S.Ct. at 1628-32 (analyzing extensively the pertinent statutory scheme and legislative history); *Bowen,* 476 U.S. at 674-80, 106 S.Ct. at 2137-41 (same); *Block,* 467 U.S. at 341-43, 346-48, 104 S.Ct. at 2450-53, 2454-55 (same). Following the analysis employed by the Supreme Court in these cases, we conclude that § 1273(e) of Title XI precludes third-party challenges to MarAd's loan guarantee decisions. This determination is premised upon the plain language of § 1273(e), as well as the legislative history and purpose of Title XI, to which we now turn.

10

*C. The Legislative History and Structure of Title XI*

Title XI of the Merchant Marine Act of 1936 was originally enacted into law in 1938 as a ship mortgage insurance program and was intended "to encourage the private sector to provide loans to the shipping industry at low risk during the Depression." S.Rep. No. 98-652 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5426, 5426-27; *see also* H.R.Rep. No. 83-1042 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2433, 2434. During the program's first fifteen years, however, Title XI proved relatively ineffective in attracting private capital for shipbuilding. *See* H.R.Rep. No. 83-1042, *reprinted in* 1953 U.S.C.C.A.N. 2433, 2434.

With its original goal—that of attracting private investment to the shipbuilding industry—still in mind, Congress reacted to private industry's sluggish response by amending the statute in 1953 and again in 1954. *See* H.R.Rep. No. 83-1042, *reprinted in* 1953 U.S.C.C.A.N. 2433; H.R.Rep. No. 83-2450 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4011; *see also* S.Rep. No. 92-1137 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3851, 3864 (noting that only twelve transactions were entered into during the period from 1938 to 1953). Changes to Title XI were necessary because private investment had "been reluctant to undertake to any appreciable extent the risks of lending money secured by ship mortgages" because "of the inherent uncertainties in the business of operating ships." H.R.Rep. No. 83-2450, *reprinted in* 1954 U.S.C.C.A.N. 4011, 4012. Congress thus sought to reduce the risks of lending money to potential shipbuilders, and one way it did so was by enacting the

11

predecessor to § 1273(e).

Kirby agrees, as it must, that Congress intended to secure private financing for shipbuilding in part by strengthening the MarAd's loan insurance commitment from post hoc challenge. Kirby argues, however, that a closer reading of the legislative history supports its view that § 1273(e) serves to bar only the government from disclaiming its commitments. To this end, Kirby notes that the adoption of the predecessor to § 1273(e) was sparked by the refusal of the Comptroller General to honor government subsidies for the construction of three passenger liners, the *United States,* the *Constitution,* and the *Independence,* on the grounds that the companies building those liners had overcharged the government. *See* George Horne, *Commerce Department Drive Is On To Review U.S. Merchant Marine,* N.Y. Times, June 8, 1953, at 51; George Horne, *Ship Men Are Hopeful Congress Will End Subsidy Uncertainties,* N.Y. Times, Mar. 29, 1954, at 39. The Comptroller General's actions "badly shattered" confidence among shipbuilders regarding government subsidies, and ensured that "no line [would] build and no bank [would] put money into" the building of merchant marine vessels. *U.S. Shipbuilding: Rough Weather Ahead,* Newsweek, Mar. 1, 1954, at 64. Upon review of the legislative history and contemporary news accounts, we agree with Kirby that the predecessor to § 1273(e) was enacted in response to the Comptroller General's actions in tying up MarAd's shipbuilding subsidies.

Despite our agreement with Kirby regarding the impetus behind the passage of § 1273(e), we nevertheless differ with the

12

conclusion that Kirby draws from this history, *viz.,* that because the provision was enacted in response to the Comptroller General's actions, it was designed to estop only the government, as the issuer of loan insurance, from disclaiming its commitments, and thus does not have any effect upon third-party challenges to the loan guarantees such as the instant litigation.

The legislative history highlights our disagreement with Kirby in three different ways. First, the statutory development of § 1273(e), as seen by the textual changes to that subsection, illuminates Congress's intent to make MarAd's loan guarantees certain and also to preclude challenge from third parties as well as from the government. Second, the legislative history and structure of Title XI in general and statements of the witnesses who testified before the various legislative committees and subcommittees considering the proposed amendments also reflect the intent of Congress and industry participants to make the loan commitments absolutely immune from challenge. Third, Kirby's argument that § 1273(e) bars only the government from invalidating MarAd's loan guarantees is weakened by a logical flaw: the legislative history shows not that Congress intended to prevent MarAd itself from backing out of its loan commitments (for such a situation would directly correspond to Kirby's insurance analogy) but that Congress was interested in preventing third parties, be it the Comptroller General or putative competitors, from invalidating MarAd's commitment.

### 1. The Textual Development of § 1273(e)

13

First, we turn to the statutory development of § 1273(e). As originally enacted in 1953, that subsection provided:

> Any contract or commitment of insurance entered into by the Secretary of Commerce under this title shall be final and conclusive and shall not be subject to avoidance by any officer, employee, or agent *of the United States,* except in case of fraud, duress, or mutual mistake of fact.

Pub.L. No. 83-288, § 3, 67 Stat. 627 (1953) (emphasis added). The plain language of the 1953 provision, as evidence of Congress's intent, is relatively clear. It shows that Congress was most concerned that officers of the United States would attempt to avoid insurance commitments entered into by the Secretary of Commerce.

In 1954, however, this provision was significantly broadened:

> Any contract or commitment of insurance entered into by the Secretary of Commerce under the provisions of this title *shall not be terminated, canceled, or otherwise revoked for any reason,* except as provided in section 1105 of this title, and shall be conclusive evidence that the mortgage or loan complies fully with the provisions of this title and of the approval of the principal amount, interest rate, and all other terms of the mortgage or loan and of the mortgagor or borrower and of the mortgagee or lender; any contract or commitment of insurance so entered into shall *be incontestable* from the date as of which such contract or commitment is entered into, except for fraud, duress, or mutual mistake of fact.

Pub.L. No. 83-781, § 5, 68 Stat. 1267, 1274-75 (1954) (emphasis added). By widening the scope of this provision, the 1954 amendment reflects Congress's intent to preclude all challenges to MarAd's loan commitments. First, Congress replaced the 1953 phrase, "not subject to avoidance by ... the United States," with much more comprehensive language in 1954: "any contract or commitment of insurance so entered into shall be incontestable." We cannot help but conclude that Congress, by deleting the reference to the United States and substituting the more general

14

word, "incontestable," intended to prevent any party, and not just the United States, from contesting the loan guarantees.

Second, Congress's intent to broaden the scope of § 1273(e) can be gleaned from another 1954 amendment to that provision, which added the following language: "Any contract or commitment of insurance ... shall not be terminated, canceled, or otherwise revoked for *any reason,* except as provided in section 1105 of this title." Pub.L. No. 83-781, § 5, 68 Stat. 1274-75 (1954) (emphasis added).[3] The phrase, "any reason," is very broad, and it must be given its logical meaning; it necessarily includes "any" challenge to loan commitments, even those brought by third parties.[4]

The 1972 amendments to § 1273(e) also reflect Congress's intent to immunize Title XI loan guarantees from challenge. That provision, as amended in 1972, provided:

---

[3]The exception permits cancellation of the insurance contract when the borrower defaults and the Secretary of Commerce elects to pay off the outstanding principal and interest. *See* Pub.L. No. 83-781, § 5, 68 Stat. 1272-73 (amending section 1105(a) of the Merchant Marine Act of 1936).

[4]Quoting selectively from the legislative history, Kirby insists that the 1954 amendment was not intended to substantively change the meaning of § 1273(e). *See Private Financing of New Ship Construction: Hearings on S. 3219 Before a Subcomm. of the Comm. on Interstate and Foreign Commerce,* 83d Cong. 132 (1954) ("This amendment, except the change which provides for terminating the insurance contract for special reasons, is not intended to change the substance of this subsection, but is intended to clarify it."). This quote, however, is not found in the Senate or House Committee Reports; instead, it is a quote from a letter written by marine industry officials regarding the proposed amendments. While we consider the views of private industry in analyzing the legislative history, we are not willing to give inordinate weight to a single statement and do not believe that a single phrase from an industry official can abrogate inferences drawn from amendments to the text of § 1273(e).

15

> Any guarantee, or commitment to guarantee, made by the Secretary of Commerce under this title shall be conclusive evidence of the eligibility of the obligations for such guarantee, and the validity of any guarantee, or commitment to guarantee, so made shall be incontestable.

Pub.L. No. 92-507, § 3, 86 Stat. 910 (1972). The most important amendment was the elimination of the language that allowed challenges to MarAd's loan guarantees when such commitments were marred by fraud, duress, or mutual mistake. By removing this exception, Congress indicated that it intended to immunize completely the loan guarantees from challenge, despite the presence of fraud, duress, or mutual mistake. Viewed in conjunction with the 1954 amendment to § 1273(e), Congress's intent is plain: it sought to preclude MarAd's loan commitments from all challengers and in all instances.

### 2. The Structure and History of Title XI

Second, we look to the structure and legislative history of Title XI. It is clear from the Senate and House Committee Reports accompanying the 1953 and 1954 amendments to Title XI that the purpose of the Act is to encourage private investment in the building of ships by abating the risk to lenders of a vessel owner's default. *See, e.g.,* H.R.Rep. No. 83-2450, *reprinted in* 1954 U.S.C.C.A.N. 4011, 4012; H.R.Rep. No. 83-1042, *reprinted in* 1953 U.S.C.C.A.N. 2433, 2434. In furtherance of this goal, Congress took steps to ensure that government loan insurance would always be honored by enacting the incontestability provision currently found in § 1273(e) into law. Kirby's reading of this provision is untenable because such an interpretation would allow

16

a third party to challenge—and delay or even invalidate—loan guarantees in the same manner as did the Comptroller General in the 1950s. It is difficult to believe that it could have been Congress's intent to prevent challenges by the Comptroller General but to allow challenges by third-party competitors. From the point of view of an investor, it makes little difference if the guarantee is invalidated by the government or by a federal court in response to a third-party complaint. A loan guarantee that could be overturned at the behest of a competitor is not the low-risk investment contemplated by Congress. Instead, as the Government notes, it is a half-way measure that would offer little solace to investors and would certainly not assuage investor confidence that was shaken by the actions of the Comptroller General in the early 1950s. Congress recognized that there was a crisis arising from the quickly-approaching obsolescence of the American merchant fleet, and it thus took the admittedly drastic action of insulating MarAd's loan guarantee determinations from review.

Further, the industry participants in the congressional hearings also believed that the 1954 amendments—and in particular, the predecessor to § 1273(e)—would have the effect of precluding all challenges to the loan insurance contracts. The fact that the industry officials and legislators may have been primarily influenced by the actions of the Comptroller General does not mean that Congress intended to preclude challenges by the government only. Indeed, the industry representatives made it clear that finality of the loan insurance was paramount, and that investment

17

was unlikely to occur without elimination of all uncertainty caused by the potential for subsequent litigation and invalidation of such insurance. As Mr. Rudolph S. Hecht, chairman of the board of the Mississippi Shipping Co., noted:

> ... the investor can be induced to put his money into this kind of financing, which he has never done heretofore. But if you leave any uncertainly [sic] as to the finality of this thing, once the money is put out, then this bill will not work. The investors will not put up their money because that is the uncertainly [sic] that no investor will take, especially in the shipping industry, which is a feast and famine industry, as you well know.

*Hearings on H.R. 8637,* 83d Cong. 21 (1954). This concern was amplified by Jerome S. Katzin, of Kuhn, Loeb & Co:

> If there is the slightest doubt over the firmness of the Government's obligation on these insured mortgages, these securities cannot be sold at anything approaching the terms anticipated. We must assume that the Congress intends, and the language of the statute will clearly provide, for a firm Government obligation which is clear, definite, and unalterable.

*Id.* at 67. The situation created by Kirby's challenge to MarAd's loan guarantees is exactly the situation the shipping industry sought to prevent: a challenge to the certainty of the loan guarantees. That members of the shipping industry made such statements in response to the Comptroller General's challenge to earlier government subsidies is ultimately not persuasive. The investors and shipping industry officials were aware of a known risk, and they sought to prevent its reoccurrence. It is illogical to think that they would have allowed a similar, but perhaps unknown, risk resulting in the same consequences, *viz.,* the invalidation of government loan obligations.

The 1972 amendments also support our belief that § 1273(e),

18

when viewed in conjunction with the overall scheme of Title XI, precludes judicial review.  Congress understood that some private investors had not participated in Title XI's program because of the complexities involved in receiving loan insurance, and it thus amended Title XI from a loan insurance program to a loan guarantee program.  *See* Pub.L. No. 92-507, § 3, 86 Stat. 910 (1972) (codified as amended at 46 U.S.C.App. § 1273(a)).  The fact that Title XI is no longer a loan insurance program cuts against Kirby's insurance-derived definition of the language found in § 1273(e).

The 1972 amendments also included provisions requiring the government—and not the lender—to take a security interest in the vessel as collateral in the event of default.  *See* Pub.L. No. 92-507, § 3, 86 Stat. 910 (1972) (codified as amended at 46 U.S.C.App. §§ 1273(b), 1275);  *see also* S.Rep. No. 92-1137, *reprinted in* 1972 U.S.C.C.A.N. 3851, 3853, 3858, 3861;  46 U.S.C.App. §§ 1273(b), 1275.  As such, private investors have no protection against a vessel owner's default except for the government's guarantee.  If these guarantees could be invalidated in a subsequent judicial proceeding, then investors—who have no security interest in the vessel—would be left completely unprotected by Title XI. This result would be at odds with the express intent of Congress.[5]

As the foregoing recitation of the legislative history has demonstrated, the overarching purpose of Title XI is to attract

---

[5]Although the loan insurance/guarantee program—with some version of § 1273(e)—has been in effect for over 40 years, Kirby points us to no case in which a court has assumed jurisdiction to consider the validity of MarAd's loan commitment decision.

private investment for the construction of vessels.[6]  Congress sought to achieve this goal by minimizing the risk of default to those investors, and the incontestability provision that was adopted in 1953 and amended in 1954 and 1972 accords with the purpose of Title XI, for it ensures that MarAd's decision to issue loan guarantees is insulated from challenge, thereby further minimizing the risk to investors.[7]

### 3. The Insurance Analogy

Finally, Kirby's insurance-derived meaning of § 1273(e) is deeply flawed.  When viewing the text of § 1273(e) without studying the legislative history, Kirby's argument appears somewhat logical: incontestability clauses are found in insurance contracts;  they do prevent insurers, after a certain period of time, from rescinding a policy or denying a claim based upon, *inter alia,* a misrepresentation by an insured;  the provision found in § 1273(e)

---

[6]It is true, as Kirby notes, that it is not Congress's intent to secure financing for any prospective vessel.  The regulations require the vessel owners to be United States citizens, and the Act commands MarAd to evaluate the economic soundness of a particular project.  These requirements were amplified by the 1984 amendments to Title XI, which were prompted by numerous defaults due to the "economic depression of the maritime industry."  S.Rep. No. 98-652, *reprinted in* 1984 U.S.C.C.A.N. 5426, 5427.  The 1984 amendments set forth "much stricter criteria for approving loan applications," and require the Secretary of Transportation, *inter alia,* to evaluate a loan applicant's economic soundness and the need for the prospective equipment in the particular trade.  *Id., reprinted in* 1984 U.S.C.C.A.N. 5426, 5426, 5428.

[7]In 1993, Congress deleted the citizenship requirement of Title XI, although MarAd's regulations still maintain such a requirement.  This amendment will be discussed in greater detail when our focus turns to whether we have jurisdiction pursuant to the doctrine set forth in *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

20

is similar to typical incontestability provisions found in insurance contracts; Title XI began as a government loan insurance program; and thus the incontestability provision is meant to bar only the government from rescinding its insurance obligations under Title XI. The problem with this argument is that the legislative history confirms that Congress was not specifically concerned with preventing MarAd, as the government agency that issued the loan insurance, from rescinding its commitments. It was not MarAd, the issuer of the loan insurance, that attempted to disclaim its loan commitments in the early 1950s; instead it was the Comptroller General, a legislative official and a non-party to the loan insurance commitment, who attempted to invalidate MarAd's obligation. In other words, the actions of the Comptroller General were the actions of a *third party* attempting to undo an agreement between MarAd and various shipbuilding companies. Kirby's lawsuit is a third-party challenge in much the same way. The fact that both the Comptroller General and the Maritime Administration are part of the federal government is not enlightening. What is instructive is that the Comptroller General, a non-party to the loan-insurance transaction, attempted to undo such a commitment. Or to put it another way: if we were to agree that Kirby could challenge MarAd's loan guarantee and if we did set aside the loan transaction as Kirby requests, our action in doing so would be closely analogous to the Comptroller General's actions. Congress

21

sought to prevent this from reoccurring.[8]

In conclusion, we are convinced that it was Congress's clear and convincing intent to preclude all challenges to Title XI loan guarantees. This resolution is based not only upon the text of § 1273(e), but also upon the structure of Title XI and upon the legislative history of the Act in general and § 1273(e) in particular.

II. THE *LEEDOM v. KYNE* EXCEPTION

Although § 1273(e) of Title XI is a statutory bar to judicial review, there is an implicit but narrow exception that permits

---

[8]We are also unmoved by Kirby's contention that clauses similar to that found in § 1273(e) contained in other federal statutes were held to preclude only the government from disavowing its insurance commitments. *See First Interstate Bank of Billings v. United States,* 61 F.3d 876 (Fed.Cir.1995); *Hicks v. United States,* 65 F.2d 517 (4th Cir.1933); *Carman v. Richardson,* 357 F.Supp. 1148 (D.Vt.1973); *Jay F. Zook, Inc. v. Brownstein,* 237 F.Supp. 800 (N.D.Ohio 1965); *Neuhard v. United States,* 83 F.Supp. 911 (M.D.Pa.1949). Four of these cases concerned suits brought against the government to enforce an insurance contract, and they dealt with the government's efforts to avoid the contract despite the incontestability provision. The question whether a party other than the government could challenge the insurance commitment was not even at issue in any of those four cases. Further, the incontestability clause in each was not absolute like the one found in § 1273(e), and each allowed the government to challenge the insurance when there was fraud on the part of the insured. *See First Interstate Bank,* 61 F.3d at 877; *Hicks,* 65 F.2d at 519; *Jay F. Zook, Inc.,* 237 F.Supp. at 806; *Neuhard,* 83 F.Supp. at 912. The fact that these cases analyzed the incontestability provisions in terms of the government's right to back out of its insurance commitments does not mean that incontestability provisions are applicable only as to the government.

In the fifth case, the district court did find jurisdiction over a third-party suit brought to block the issuance of federal loan guarantees under the Hill-Burton Act. *Carman,* 357 F.Supp. at 1159. In making such a determination, however, the court did not refer to or discuss the incontestability provision of that Act.

22

judicial intervention—even when the relevant statutory language precludes jurisdiction—when an agency exceeds the scope of its delegated authority or violates a clear statutory mandate. *See, e.g., Hanauer v. Reich,* 82 F.3d 1304, 1307 (4th Cir.1996). This exception finds its roots in *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

In *Kyne,* the National Labor Relations Board undisputably violated a statutory prohibition against placing professional employees into a collective bargaining group with non-professional employees. The president of a labor organization brought suit to set aside the Board's action, but the Board contended that a provision of the National Labor Relations Act ("NLRA") impliedly precluded judicial review. In considering the issue, the Supreme Court asked rhetorically whether the law, "apart from the review provisions of the ... [NLRA]," affords a judicial remedy. *Kyne,* 358 U.S. at 188, 79 S.Ct. at 183 (internal quotations omitted). Answering its own question, the Court stated, "We think the answer surely must be yes. This suit is not one to "review,' in the sense of that term as used in the [NLRA], a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the [NLRA]." *Id.*

The Courts of Appeals have only rarely exercised their jurisdiction under *Kyne,* and have limited *Kyne* 's application to situations in which an agency has exceeded its delegated powers or "on its face" violated a statute. *See, e.g., Dart v. United*

23

*States,* 848 F.2d 217, 222 (D.C.Cir.1988); *Russell v. National Mediation Bd.,* 714 F.2d 1332, 1340 (5th Cir.1983) (stating that the *Kyne* standard is "narrow and rarely successfully invoked"), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *McClendon v. Jackson Television, Inc.,* 603 F.2d 1174, 1177 (5th Cir.1979) (noting that to invoke the *Kyne* test, the error must be "of a *summa* or *magna* quality as contraposed to decisions which are simply *cum* error" (internal quotations omitted)). Indeed, the Supreme Court has also applied the *Kyne* exception only in limited instances. *See, e.g., Oestereich v. Selective Serv. Sys. Local Bd. No. 11,* 393 U.S. 233, 237-38, 89 S.Ct. 414, 416, 21 L.Ed.2d 402 (1968) ("We deal with conduct of a local [Selective Service] Board that is basically lawless.... The case we decide today involves a clear departure by the Board from its statutory mandate."). As the *Dart* court noted, the exception allowing review of facial violations must remain narrow, and "agency action allegedly "in excess of authority' must not simply involve a dispute over statutory interpretation or challenged findings of fact." *Dart,* 848 F.2d at 231. In short, judicial review is proper under the rule set forth in *Kyne,* despite there being a statutory provision prohibiting such review, because the agency's challenged action is so contrary to the terms of the relevant statute that it necessitates judicial review independent of the review provisions of the relevant statute. *See Kyne,* 358 U.S. at 188, 79 S.Ct. at 183-84.

There are two independent reasons why the *Kyne* doctrine is

inapplicable to Kirby's challenge. First, in 1993, Congress eliminated Title XI's provision requiring that prospective vessels be owned by United States citizens, *see* Pub.L. No. 103-160, § 1356(3)(A), 107 Stat. 1813 (codified at 46 U.S.C.App. § 1274(a)(1)), although this requirement is still found in MarAd's regulations. *See* 46 C.F.R. 298.10. MarAd therefore continues to impose stricter requirements on the issuance of loan guarantees than are required by law, and thus it cannot be said that MarAd violated Title XI, on the grounds that Hvide is not a United States citizen, by awarding such guarantees to Hvide.

Second, even if Title XI's citizenship requirement were still in place, Kirby's challenge under *Kyne* would fail. Its assertion that MarAd's decision to guarantee Hvide's loans is one that "facially" violates Title XI or is in excess of its delegated powers is not supported by *Kyne,* the case law interpreting it, or the facts and circumstances of the instant case. The record establishes that MarAd reviewed affidavits regarding the citizenship of board members, executive officers, and controlling stockholders, and analyzed numerous corporate documents. Only after completing this investigation did MarAd find that the Hvide limited liability companies satisfied the citizenship requirements. Kirby challenge of MarAd's factual determinations is exactly the sort not encompassed by the *Kyne* rule; Kirby seeks to review an ordinary determination by MarAd, whereas the *Kyne* standard is to be used for extraordinary situations. Kirby's disagreement with MarAd's factual determination presents a situation opposite from

25

that foreseen in *Dart. See* 848 F.2d at 222-23, 231 (noting that a court should not assume jurisdiction under *Kyne* when there is a dispute over the factual findings only). Were Kirby's interpretation of *Kyne* and its progeny correct, every alleged competitor of a company receiving shipbuilding guarantees could challenge MarAd's factual determinations despite the finality language of § 1273(e).[9]

## III. THE CITIZENSHIP DETERMINATION

Finally, Kirby argues that even if § 1273(e) precludes judicial review of MarAd's decision to issue a loan guarantee under Title XI, this Court must still address the independent question whether MarAd's subsidiary citizenship determination is reviewable. As noted previously, MarAd's regulations define citizenship by reference to section 2 of the Shipping Act of 1916, 46 U.S.C.App. § 802. Under the Hobbs Act, the "court of appeals ... has

[9]Nor are we persuaded that *Colorado State Bank v. United States,* 18 Cl.Ct. 611 (1989), *aff'd without op.,* 904 F.2d 45 (Fed.Cir.1990), supports the contention that MarAd's action is reviewable under the *Kyne* exception. Kirby cites this case as an example of a situation in which an incontestability clause did not prevent a federal court from declaring a government loan guarantee void. We do not disagree with the general proposition that an incontestability provision, such as the one found in § 1273(e), would not bar judicial review if an agency "facially" violated a statute or acted outside of its delegated authority. *Colorado State Bank* is distinguishable, however, because in that case, agency action constituted error of such magnitude as to reach the narrow exception set forth in *Kyne.* In *Colorado State Bank,* although there was no fraud or misrepresentation, the loan guarantee process "made a farce of compliance with law and the procedures that had been promulgated to protect the interest of the United States." *Id.* at 630. Even if MarAd erred in its factual findings, its decision-making process culminating in its decision to guarantee Hvide's loans did not make a farce of the applicable law and procedures.

26

exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" a final order of the Secretary of Transportation issued pursuant to, *inter alia,* section 2 of the Shipping Act of 1916. *See* 28 U.S.C. § 2342.

Although the Hobbs Act purports to give this Court jurisdiction to review citizenship determinations made pursuant to section 2 of the Shipping Act of 1916, it does not trump 46 U.S.C.App. § 1273(e), Title XI's more specific provision prohibiting judicial review. It is a well known canon of statutory construction that a specific statutory provision governs the general. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992). The Hobbs Act provides, as a general matter, that the courts of appeals are the proper fora for challenges to, *inter alia,* orders issued pursuant to section 2 of the Shipping Act of 1916. Section 1273(e) of Title XI, however, makes it clear that Congress intended to preclude judicial review of loan guarantee decisions. Because the citizenship determination is so closely bound up with the loan guarantee decision, we conclude that it was Congress's intent to preclude judicial review for such a determination as well.

CONCLUSION

The Supreme Court has cautioned that " "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.' " *Bowen,* 476 U.S. at 670, 106 S.Ct. at 2135 (quoting *Abbott Labs.,* 387 U.S. at 140, 87 S.Ct. at 1511). As the

27

foregoing analysis has shown, the text of 46 U.S.C.App. § 1273(e), the structure of Title XI, and the legislative history of the Act all evince Congress's intent to preclude judicial review of decisions by MarAd to issue loan guarantees pursuant to Title XI of the Merchant Marine Act of 1936.

Based on our analysis, we AFFIRM the district court's decision dismissing for lack of jurisdiction and we DISMISS the petition for direct review.